

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-30-2004

# USA v. Bonner

Precedential or Non-Precedential: Precedential

Docket No. 03-1547

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Bonner" (2004). *2004 Decisions.* Paper 879.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/879

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No. 03-1547

UNITED STATES OF AMERICA,

Appellant

v.

JERMANE E. BONNER

On Appeal from the United States
District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 02-cr-00046)
District Judge: Hon. Gary L. Lancaster

Argued September 16, 2003

BEFORE: MC KEE, SMITH and
COWEN, Circuit Judges

(Filed: March 30, 2004)

Mary Beth Buchanan, Esq.
Bonnie R. Schlueter, Esq. (Argued)
Office of United States Attorney
700 Grant Street
Suite 400
Pittsburgh, PA 15219

Counsel for Appellant

W. Penn Hackney, Esq.
Karen S. Gerlach, Esq.
Lisa B. Freeland, Esq. (Argued)
Office of Federal Public Defender
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222

Counsel for Appellee

OPINION

COWEN, Circuit Judge.

Jermane Bonner fled from police after the car in which he was a passenger was stopped for a routine traffic violation. The police gave chase and, upon apprehending him, discovered that he was carrying crack cocaine. The government prosecuted Bonner for possession with the intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii). The District Court suppressed all evidence seized during the stop including the drugs. This appeal by the government followed.

In suppressing the evidence, the District Court held that the officers lacked a reasonable, articulable suspicion that Bonner was involved in criminal activity. The District Court reasoned that the sole basis for the stop was Bonner's flight from police, and that under Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 570 (2000), and its progeny, mere flight when police appear on the scene is not sufficient to establish reasonable suspicion.

We will reverse. Under the facts of this case we hold that the officers had reasonable suspicion to stop Bonner. Although flight alone is not enough to justify a police stop, this is not a case of flight upon noticing police. The officers in this case were effectuating a legitimate traffic stop. During a traffic stop, police officers may exercise reasonable superintendence over the vehicle, its driver, and passengers. Because Bonner prevented the police from maintaining oversight and control over the traffic stop by fleeing, we hold that the police had reasonable suspicion to stop him.

I

On March 8, 2001, Officers Harbaugh, English, Stewart, and Sweeney were in uniform and on duty at the police security booth at the entrance to the Ohioview Acres housing project in Stowe Township, Pennsylvania. At approximately 11:40 p.m., Officer Harbaugh noticed a sports utility vehicle leaving the housing project that had one headlight out and an expired inspection sticker. He signaled for the vehicle to stop. The driver, Nathan Stewart, complied. In addition to the driver, there were two passengers: the driver's brother, Neil Stewart, in the back seat and Jermane Bonner in the front passenger seat.

As Officer Harbaugh approached the driver's side of the vehicle, Bonner alighted and ran. Officer Stewart chased after him on foot, repeatedly yelling for him to stop. Officer English gave chase in the patrol car, driving in the direction Bonner was running, then parked and continued the chase on foot.

Officer English eventually caught Bonner by tackling him. Both officers then subdued and handcuffed Bonner. While subduing him, Officer English observed a clear plastic bag in Bonner's hand. The bag contained seven golf ball sized rocks, which were later tested and found to be crack cocaine. The officers also seized $534.25 from Bonner during the arrest.

The driver and other passenger were told to put the vehicle in park, turn off the ignition, and step out of the vehicle. Both were handcuffed and detained for a brief period of time, then released with a citation for the traffic violations.

We have jurisdiction under 18 U.S.C. § 3731, and conduct plenary review of the District Court's determination that the officers did not have reasonable suspicion to stop Bonner. Ornelas v. United States, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); United States v. Valentine, 232 F.3d 350 (3d Cir. 2000). We review the District Court's findings of fact for clear error. Ornelas, 517 U.S. at 698, 116 S. Ct. at 1663.

II

As a preliminary matter, the government challenges the District Court's findings that the area was not a high crime area, and that the hour of the stop, 11:40

pm, was not significant to the reasonable suspicion inquiry. In support of its contention that the Ohioview Acres housing project was a high crime area, the government submitted a log book of arrests made at the housing project over a three-year period. As the District Court found, the log book reflected that there was an average of 1.3 arrests per week, and that most of the arrests were for misdemeanors and summary offenses. Considering the number of people who live in the housing project, the District Court found that this average reflected neither a high crime area nor trafficking in narcotics. The government contends this finding was clearly erroneous, and points to a news article as further evidence of the level of crime present in the area. Even considering the news article, however, the evidence does not compel the conclusion that the District Court erred in finding that the housing project was not a high crime area. The District Court found that the stop did occur at 11:40 p.m., but did not consider that factor relevant to its analysis of whether there was reasonable suspicion for the stop. The evidence does not compel a different conclusion. We conclude that the fact finding by the District Court was not clearly erroneous.

III

It is uncontested that the initial traffic stop was lawful under the Fourth Amendment. A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation. Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S. Ct. 330, 332, 54 L. Ed. 2d 331 (1977). It is also well settled that a police officer executing such a stop may exercise reasonable superintendence over the car and its passengers. Under Mimms, the officer may order the driver out of the vehicle without any particularized suspicion. Mimms, 434 U.S. at 110-11, 98 S. Ct. at 333. The Supreme Court extended that bright line rule to allow the officer to order any passengers out of the car as well. Maryland v. Wilson, 519 U.S. 408, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). Alternatively, the officer may order all of the occupants to remain in the car with their hands up. United States v. Moorefield, 111 F.3d 10 (3d Cir. 1997). In addition, the officer may pat down the occupants of the vehicle and conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed and dangerous. Michigan v. Long, 463 U.S. 1032, 1049-50, 103 S. Ct. 3469, 3481, 77 L. Ed. 2d 1201 (1983) (permitting search of vehicle during traffic stop); Mimms, 434 U.S. at 111-112, 98 S. Ct. at 334 (permitting pat down of driver upon reasonable suspicion); Terry v. Ohio, 392 U.S. 1, 17, 88 S. Ct. 1868, 1877, 20 L. Ed. 2d 889 (1968); Moorefield, 111 F.3d at 13-14 (permitting pat down of passenger upon reasonable suspicion).

The government asserts that the police officers ordered Bonner and the other occupants to stay in the vehicle. At the suppression hearing, however, there was conflicting testimony whether the

3

officers said anything before Bonner ran. The District Court made no finding with respect to what, if anything, the officers said before Bonner got out of the vehicle and ran. We will assume for the purpose of this opinion that the officers did not issue any commands before Bonner began running. But even absent a specific command, it is undisputed that Bonner, an occupant of the stopped vehicle, ran from the scene of a legitimate traffic stop without authorization or consent of the officers. During such a stop, a police officer has the authority and duty to control the vehicle and its occupants, at least for a brief period of time.[1] Bonner prevented Officer Stewart from controlling the stop by running from the vehicle before the purpose of the stop was even announced.

Under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and

---

[1]The Supreme Court has never addressed the question of whether, during a lawful traffic stop, the police could detain any passengers for the entire duration of the stop. Indeed, the Court explicitly left that question open when it held that the police could order passengers out of the car during a stop. Maryland v. Wilson, 519 U.S. 408, 415 n. 3, 117 S. Ct. 882, 886 n. 3, 137 L. Ed. 2d 41 (1997). That question is not before us, as Bonner fled before the purpose of the stop was announced, and before the police could exercise the initial control authorized by Wilson and other cases.

its progeny, an officer may conduct a brief, investigatory stop when that officer has "a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000). Although reasonable suspicion is less demanding than probable cause, the Fourth Amendment does require that an officer making a stop have some level of objective justification for that stop. United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989). In evaluating whether a particular stop was justified, courts must look at the totality of the circumstances surrounding the stop. Sokolow, 490 U.S. at 8, 109 S. Ct. at 1586 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed.2d 621(1981)). In effectuating a valid stop, police officers are allowed to use a reasonable amount of force. Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Bonner argues that flight, standing alone, is not sufficient to engender reasonable suspicion on the part of a police officer. Indeed, the Supreme Court has never held that unprovoked flight alone is enough to justify a stop. The Supreme Court has held, however, that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion. Wardlow, 528 U.S. at 125-26, 120 S. Ct. at 676-77. The "plus" factor was Wardlow's mere presence in an area known for high narcotics trafficking. Wardlow, 528 U.S. at 124, 120 S. Ct. at 676. In holding that flight plus presence in a high crime area justified the stop, the

4

Court explained, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125, 120 S. Ct. at 676.

In Wardlow, eight officers in a four-car caravan converged on a neighborhood known for high narcotics trafficking. Upon arriving in the area, two of the officers noticed the defendant standing near a building, holding a bag. The defendant looked in the direction of the officers and then fled. Wardlow, 528 U.S. at 122, 120 S. Ct. at 675. Before he ran, the officers had no reason to suspect the defendant of any wrongdoing, and had no legitimate cause to detain him; the defendant simply fled from the possibility of a consensual encounter with the police.

Mere presence in an area known for high crime does not give rise to reasonable suspicion for a stop. Brown v. Texas, 443 U.S. 47, 52, 99 S. Ct. 2637, 2641, 61 L. Ed. 2d 357 (1979). Police officers may approach individuals without reasonable suspicion or probable cause, and may question such individuals without implicating the Fourth Amendment. Florida v. Royer, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229 (1983). An individual approached in this manner "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." Royer, 460 U.S. at 498, 103 S. Ct. at 1324 (citing Terry v. Ohio, 392 U.S. 1, 32-33, 88 S. Ct. 1868, 1885-86 20 L. Ed. 2d 889 (1968) (Harlan, J. concurring);

Terry, 392 U.S. at 34, 88 S. Ct. at 1886 (White, J. concurring)). Moreover, a refusal to cooperate with the police in a consensual encounter, without more, cannot constitute reasonable suspicion for a stop. Florida v. Bostick, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991) (citations omitted).

In this case, however, Bonner did not simply flee upon "noticing" police, nor did he simply refuse to cooperate during a consensual encounter. Bonner fled from a lawful traffic stop, before the officers had the chance to announce the purpose of the stop. He continued fleeing despite repeated orders to stop, and he did not stop running until he was tackled by Officer English. Bonner's flight from a lawful police traffic stop, where that flight prevented the police from discharging their duty of maintaining oversight and control over the traffic stop, provided the officers with reasonable suspicion to stop Bonner for further investigation. Flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion.

IV

By reason of Bonner's flight in the course of a legitimate traffic stop, the officers had reasonable suspicion to stop him. Upon effectuating the stop the drugs were revealed, giving probable cause to arrest. The judgment of the District Court entered on February 12, 2003, will be

reversed. The case will be remanded to the District Court for further proceedings consistent with this opinion.

*United States v. Bonner*, No. 03-1547

Smith, <u>Concurring</u>.

Because I agree that "flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion," I join Judge Cowen's opinion in full. Maj. op. at 5. I write separately only to highlight an issue implicated in the District Court's fact-finding which we have not been required to address: whether under the flight "plus" analysis of *Wardlow*, 528 U.S. 119, the government is required to prove the existence of objective criteria for what constitutes a high crime area and that the stop occurred in such an area, or rather that the government is required to prove that officers effecting the stop had a reasonable articulable basis to believe that they were in a "high crime area."[2] I point this out

because I believe these alternatives require the District Court to conduct fundamentally different inquiries, even though the evidence offered for both may be overlapping or even identical.

Here, the District Court found that "the government has not shown by a preponderance of the evidence that Ohio View Acres is such an area." After reviewing the relevant evidence, the District Court declared that evidence "hardly makes Ohio View Acres a heavy crime and narcotics trafficking area."

What I am concerned about in these *Wardlow*-type cases is the fact-finder's focus: should it be that of a federal judge, operating within the confines of a courtroom, who believes the area to be one of high crime, or that of a police officer who, based on experience and an awareness of crime and arrest data, had a

---

[2]Judge Cowen describes this factor as whether the area was a "high crime area." Maj. op. at 2. The District Court's analysis, however, was more limited and addressed only whether this was a "high narcotics trafficking area." As there are many crimes which do not involve narcotics trafficking, an area could be one

in which there is a high volume of crime, but does not qualify as a "high narcotics trafficking area." Because the test should be the same for either analysis, however, the distinction is not material for purposes of this concurrence. For purposes of continuity, then, I adopt Judge Cowen's articulation of the question–whether the area was a "high crime area."

basis to form a reasonable articulable belief that it is such an area?[3] Obviously, the differences in focus are not only differences of experience and perspective. A judge engaged in adjudicative fact-finding will apply standards of credibility and proof that differ from the cognitive processes of an officer acting in the field.

The touchstone of *Terry v. Ohio* is its requirement that a court consider whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]" 392 U.S. at 21-22 (1968) (citing *Carroll v. United States*, 267 U.S. 132 (1925); *Beck v. Ohio*, 379 U.S. 89, 96-97 (1964)). As explained by the Supreme Court in *United States v. Cortez*, 449 U.S. 411, 418 (1981), an officer's suspicion that criminal activity is afoot may be informed by "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions–inferences and deductions that might well elude an untrained person." *See also United States v. Arvizu*, 534 U.S. 266, 274 (2002) (officers may "draw on

their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (internal quotation marks omitted); *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing court must give the appropriate weight to factual inferences drawn by local law enforcement officers). In the same way, an officer is in the position to know the routines and patterns of a geographic area, and whether it is more prone to crime. This knowledge may not be reflected on arrest records and log sheets, as arrests are not the only indicia of crime. In any case, we need not resolve the issue here.

I agree that the evidence offered by the government does not compel the conclusion that the District Court erred in finding that Ohio View Acres was not a high crime area. And even if the District Court were required to determine whether the officers had a reasonable articulable basis to believe it was a high crime area, such a finding would contribute nothing to the result here because the government has demonstrated flight "plus" by other evidentiary means.

Finally, although I join Judge Cowen in reversing the District Court, I echo the sentiments of Judge McKee expressed in Part III of his dissent.

It should be a rare occasion when judges criticize, and thereby intrude into, a legitimate exercise of prosecutorial discretion. Nor should we routinely

---

[3]*Wardlow* did not resolve this issue because it appears that in that case there was no dispute that the stop took place in a high crime area. In the case before us, the District Court did confront a factual dispute on this issue.

question in our opinions the policy decisions of Congress to federalize what has traditionally been state law street crime. Our institutional role as judges is limited by our jurisdiction and by the comity and respect we owe to coordinate branches of government.

That being said, the instant case presents a series of events which the dissent characterizes as a prosecutorial "switcheroo." I cannot disagree with that characterization, and I share the "concern for the appearance of fairness" expressed by Judge McKee. It is one thing for the government to assume an investigation initiated by state law enforcement officials, or even to adopt a prosecution commenced by state prosecutors. It is quite another to seek a federal indictment where the federal interest in the case is recognized only after state prosecutors have given the case their best shot in the state courts and lost on an issue of state law. Not only does such a tactic offend fundamental notions of fairness, it is contrary to traditional notions of our federalism.

*U.S. v. Bonner, No. 03-1547*

McKee, <u>Dissenting</u>

I must respectfully dissent, because I believe the majority's analysis is inconsistent with *Terry v. Ohio*, 392 U.S. 1 (1968), and *Illinois v. Wardlow*, 528 U.S. 119 (2000). Although I view this case a bit differently than the district court, I nevertheless conclude that Supreme Court precedent compels us to affirm the district court's order suppressing the evidence that was seized in this case. Moreover, although I do not think the circumstances here establish a *Terry* stop, I do agree that we must begin our analysis with the Supreme Court's decision in *Terry*.

## I. *Terry v. Ohio*

In *Terry,* the Supreme Court held that a police officer may approach an individual "for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," and briefly detain him/her in order to fulfill "[a] legitimate investigative function [.]" 392 U.S. at 22.

The police officer in *Terry* approached and briefly detained two individuals after observing their suspicious behavior from a distance and concluding that they were casing a store that they were about to burglarize. The *Terry* Court held that the Fourth Amendment allowed the officer to briefly detain them in order to conduct a brief investigation into their suspicious behavior. Since the individuals' actions also suggested that they might be armed, the Court also concluded that the Fourth Amendment allowed the officer "to conduct a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault [the officer]." *Id*. at 30. The Court explained:

> The actions of [the defendants] were consistent with the officer's hypothesis

8

that these men were contemplating a daylight robbery -- which, it is reasonable to assume, would be likely to involve the use of weapons -- and nothing in their conduct from the time he first noticed them until the time he confronted them and identified himself as a police officer gave him sufficient reason to negate that hypothesis.

*Id*. at 28.

Therefore, "under *Terry v. Ohio* and subsequent cases, 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop if the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (internal citation omitted). The Supreme Court has explained that:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Id*. (internal quotation marks omitted) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Accordingly, absent probable cause, an individual's detention must be supported by "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000). However, Bonner was "detained" after the vehicle he was riding in was stopped for a traffic infraction, and the Supreme Court has allowed greater latitude in the context of traffic stops.

### A. *Terry* applied to traffic stops

*Terry* was first implicated in the context of a lawful traffic stop in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). There, a police officer legally stopped a car for a traffic violation and ordered the driver to get out. The officer was not motivated by any particularized suspicion in doing so; rather, it was the officer's policy to order drivers out of their cars "as a matter of course whenever they had been stopped for a traffic violation." *Id*. at 109-10. Once the driver was out of the car, the officer noticed a bulge under the driver's jacket and the officer immediately conducted a "pat-down" search because he believed the bulge was

9

a weapon. *Id.* at 111-12. As a result of that search, a gun was seized, and the defendant was thereafter arrested.

The Supreme Court held that the search did not violate the Fourth Amendment. The Court reasoned that considerations of safety justified allowing police to order drivers to get out of their vehicles during lawful traffic stops because weapons could be concealed inside the vehicle in easy reach of the driver. Since police could lawfully order the driver out of the vehicle, the Court concluded that, under *Terry*, the officer was "justified in conducting a limited search for weapons once he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous." *Id.*

The Court extended the rule of *Mimms* to include passengers of lawfully stopped vehicles in *Maryland v. Wilson*, 519 U.S. 408 (1997). There, as in *Mimms*, a traffic violation created the grounds to legally stop an automobile. The police ordered the passenger out of the car as a precaution, not because of any suspicion of illegality. The *Wilson* Court had no difficulty concluding that the same considerations of safety present when drivers are ordered to get out of a stopped vehicle outweighed the minimal intrusion on any passenger who is ordered out of a car that has been legally stopped for a traffic infraction. *Id.* at 414. The *Wilson* Court found that, "as a practical matter, the passengers are already stopped by the virtue of the stop of the vehicle," and the order to get out of the car creates only a

minimal additional intrusion. *Id.* at 413-14. In addition, "the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer." Moreover, "the motivation of a passenger to employ violence to prevent apprehension. . . is every bit as great as that of the driver." *Id.* at 414.

**B. Bonner was not detained under *Terry***

The majority's analysis assumes that we are confronted with a *Terry* stop, and the district court ultimately analyzed the detention under *Terry*. However, after reviewing the transcript of the suppression hearing, it is clear to me that the police officers who "stopped" Bonner were not basing their actions on any reasonable, articulable suspicion as is required under *Terry*. They certainly never were able to explain their conduct by establishing any such suspicion despite having every opportunity to do so during the suppression hearing. I think it telling that, at the very beginning of the suppression hearing, the district court asked the government if Bonner was searched pursuant to a *Terry* stop. The court inquired: "I understand that this is a warrantless search; is that a *Terry v. Ohio* search?" App. at 127. The government's response did not confirm a *Terry* stop. Rather, counsel stated: "This was a search incident to arrest." *Id.*

It is not surprising that the government did not argue *Terry* initially because the testimony that the government produced at the suppression hearing did

10

not establish a *Terry* stop. Rather, the testimony was consistent with, but fell short of establishing, a search incident to a valid arrest. The seizure can not be justified on that basis because the testimony failed to establish probable cause for an arrest other than mere flight. *See United States v. Myers*, 308 F.3d 251, 265-66 (3d Cir. 2002).[4]

When Officer English was asked why he chased Bonner he responded: "They were exiting a high crime area, known trafficking (sic), and the officers informed the Defendant to stop and get back into the vehicle, and he failed to comply with the officer's orders." App. at 148. However, the district court rejected the testimony that Bonner was ordered back into the car as well as the officer's testimony about a "high crime area" or one known for "narcotics trafficking." *Id*. at 17.[5] We reverse the district court's factual

findings only when they are clearly erroneous, i.e. when they are "completely devoid of a credible evidentiary basis or

between establishing that an area is a "high crime area" versus establishing an officer's good faith belief that it is one. I do not suggest that the district court was correct to the extent that it required the government to prove that the area is actually "a high crime area" by a preponderance of the evidence. Rather, the inquiry must be the subjective belief of the arresting officer. However, it is clear under *Terry* that the subjective belief must be objectively reasonable. *Hill v. California*, 401 U.S. 797 (1971). Absent more than was offered at the suppression hearing, the district court's inquiry undermined the objective reasonableness of any subjective belief that the area in question was a "high crime" area or known for "narcotics trafficking."

Moreover, I think that the requirement of an objectively reasonable belief addresses Judge Smith's concern that such determinations are being made by judges in the comfort of their courtrooms rather than by officers in the streets. *See* Concurring Op. at 2. Although proper deference must be afforded to the training, experience, and knowledge of police officers, as well as the trying circumstances facing them, the Constitution does not allow us to abdicate our responsibilities in favor of their judgments simply because we are operating within the comfortable confines of a courtroom or appellate chambers.

---

[4] Despite its initial inquiry into a search incident to arrest, the district court did base its ruling on *Terry*. App. at 18-19 ("Bonner's flight alone is insufficient to create a reasonable articulable suspicion that he was involved in criminal activity. . . . Because this court finds that the government failed to meet its burden of showing Bonner's stop was supported by a reasonable articulable suspicion of criminal conduct, the stop and seizure violated Bonner's Fourth Amendment rights.").

[5] In his concurring opinion, Judge Smith correctly notes the distinction

bear no rational relationship to the supporting data."[6] Here, the district court's findings of fact are clearly supported by the record.

There was conflicting testimony about whether the officers said anything to Bonner before he ran, and the court discredited the officers' conflicting testimony that they did. *Id*. at 15. Thus, as Judge Smith summarizes in his concurring opinion, the issue before us may be distilled as whether "flight from a non-consensual, legitimate traffic stop . . . [by itself] gives rise to reasonable suspicion." *See* Concurring Op. at 1, and Maj. Op. at 9.

Bonner was chased, tackled and handcuffed simply because he ran. That is absolutely consistent with Officer English's testimony at the suppression hearing. Officer English was asked the following question: "[T]he reason Mr. Bonner was being chased was because he started running, correct?" The officer responded: "That's the reason the initial chase was started, I believe." App. at 153. Officer English described the stop as follows:

> I eventually caught up with the Defendant, and we fell to the ground. . . . The Defendant continued to try to get up away from me. I

had him in a grasp around the waist; he continued to try to get up and get away from me. . . . I informed him numerous times to place his hands behind his back and quit resisting.

App. at 149. The officer was then asked whether or not it was necessary to forcibly place Bonner's hands behind his back and Officer English confirmed that he was able "to subdue the Defendant" together with Officer Sweeney and Officer Stewart. *Id*. Therefore, the district court was quite correct in stating: "The only pertinent factor is Bonner's flight." App. at 18.

The majority states that Officer English observed a plastic bag in Bonner's hand "[w]hile subduing him." Maj. Op. at 4. However, Officer English actually stated that he did not see the bag until *after* Bonner had been handcuffed. Officer English stated that after he was finally able to subdue Bonner, the officers discovered that "he was clutching a plastic baggie. . .". App. at 149. The other officer, Officer Stewart, was never asked when he first saw the baggie that Bonner was clutching. The only relevant testimony on this record is English's testimony that he noticed the bag after Bonner was subdued, not before or while he was being subdued. Officer Stewart testified that he saw Officer English take something out of Bonner's hand "[a]fter he was in handcuffs." App. at 136.

"It is the state's burden to demonstrate that the seizure it seeks to

---

[6] *United States v. Taftsiou*, 144 F.3d 287, 293 (3d Cir. 1998); *see also United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

12

justify on the basis of the reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983). *Terry*, like *Mimms* and *Wilson*, recognized that officers who briefly detain individuals for investigation based upon articulable suspicion need to protect themselves and that concerns for the safety of the officer and others justify certain limited steps consistent with that concern. The *Terry* Court explained:

> [W]e can not blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that an individual whose suspicious behavior he is investigating at close range is armed and dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary reasonable measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24. Nevertheless, the Court remained cognizant of "the nature and quality of the intrusion" of the person detained. *Id*. It concluded that the authority conferred on the Fourth Amendment for a brief detention must be "narrowly drawn. . . to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for the crime." *Id*. at 27. Thus, "[t]he manner in which the seizure and search were conducted is . . . as vital a part of the inquiry as whether they were warranted at all." *Id.* at 28.

As noted above, the *Mimms* Court held that police may order the driver of a lawfully stopped automobile to step out of the car for the officer's own protection, stating that "a significant percentage of murders of police officers occurs when the officers are making traffic stops." 434 U.S. 106, 110 (1977) (internal citation and quotation marks omitted). The danger is reduced with only minimal additional intrusion by allowing officers to "control" the situation to the extent of ordering occupants out of the car. "Establishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver," or passenger, "can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault." *Id*. "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command

13

of the situation." *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981) (internal citation omitted).[7]

However, my colleagues have severed the rule from its analytical moorings. They are applying the rule here even though the police did not even attempt to explain their actions in terms of any perceived threat from Bonner getting out of the car and any danger arose from chasing, tackling, and subduing an occupant of a stopped vehicle who was merely trying to leave. Of course, I do not mean to suggest that flight necessarily eliminates the danger the Court was concerned with in *Terry*, *Mimms* or *Wilson*. However, I think it a stretch to equate law enforcement's need to control a driver or passenger with the officers' need to control Bonner here. Officer English clearly testified that Bonner was chased and handcuffed because he ran away from a stopped car. No other justification is offered, except by my colleagues. Accordingly, I believe this seizure can only stand only if it can be justified as a search incident to a valid warrantless arrest.

The government no doubt realized this and therefore, as explained above, told the suppression court that was precisely the justification for the search. However, absent probable cause to arrest Bonner, the search can not be sustained as a search incident to an arrest. *United States v. Myers*, 308 F.3d 251, 265-66 (3d Cir. 2002). Moreover, even if we view this as a *Terry* stop, I would still conclude that the district court's suppression order was correct because there is nothing to establish reasonable suspicion but Bonner's flight.

In addition, as noted above, the scope and duration of the detention authorized under *Terry* must be consistent with the articulable suspicion underlying the detention; that is the *sine qua non* of *Terry*. It is the basis for eliminating the requirement of probable cause before detaining someone. As the Court stated in *Florida v. Royer*, 460 U.S. 491, 500 (1983), "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify the officer's suspicions in a short period of time." *Terry* does not authorize police to chase, tackle and handcuff one who runs away from them based solely on flight. Moreover, I do not believe other precedent can support that level of intrusion either.

## II. Detention Based on Flight Alone

To determine if Bonner was legitimately detained based solely on his flight, we must examine two Supreme Court cases regarding an individual's right

---

[7] In *United States v. Moorefield*, 111 F.3d 10, 12-13 (3d Cir. 1997), we held that police could order a passenger in a lawfully stopped car to remain inside with his/her hands in the air based upon the same considerations of safety relied upon in *Mimms* and *Wilson*.

to walk away from police officers; *Florida v. Royer*, 460 U.S. 491 (1983), and *Illinois v. Wardlow*, 528 U.S. 119 (2000).

## A. *Florida v. Royer*

In *Royer*, the Supreme Court held that there is no obligation to submit to inquiries when approached by police. The Court also held that refusal to submit to police questioning or cooperate with a police inquiry does not, without more, furnish the necessary grounds for detention. 460 U.S. at 497-98.

> Prior to *Terry v. Ohio []*, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Terry* created a limited exception to this general rule: search and seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime.

*Id*. at 498 (citations omitted).

Thus, the *Royer* Court reinforced the fact that *Terry* did not create a license to detain for investigation in the absence of articulable suspicion. The Court also stressed that "[d]etentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause." *Id*. at 499. "In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person. . . . Nor may the police seek to verify their suspicions by means that approach the conditions of arrest." *Id*. (citing *Dunaway v. New York*, 442 U.S. 200, 207-09 (1979)).

The majority notes that Bonner was the occupant of a stopped vehicle who "ran from the scene of a legitimate traffic stop *without authorization or consent* of the officers," and assume that analysis under *Mimms* and *Wilson* is appropriate. Maj. Op. at 6 (emphasis added). However, under *Royer*, it is irrelevant that Bonner left the vehicle without the police officers' authorization. *Royer* did not condition an individual's right to go on his/her way on first obtaining police permission. In fact, conditioning the right to leave a police inquiry on the street on obtaining "authorization or consent" would totally negate *Royer*'s holding. As the majority correctly notes, a refusal to cooperate with the police in a consensual encounter, without more, can not constitute reasonable suspicion for a stop. Maj. Op. at 9 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

The difficulty with analyzing this case stems not from *Royer* but from *Illinois v. Wardlow*, 528 U.S. 119 (2000). The Court's language there creates some tension with its prior holding in *Royer* even though the *Wardlow* Court was careful to explicitly reaffirm the holding in *Royer*.

15

## B. *Illinois v. Wardlow*

In *Wardlow*, the Court held that police properly conducted a *Terry* stop of an individual who fled after looking in the direction of an approaching police caravan in "an area known for heavy narcotics trafficking." 528 U.S. at 121. The Court summarized *Royer* as holding "that when an officer, without reasonable suspicion or probable cause, approaches an individual, an individual has a right to ignore the police and go about his business." *Id*. at 125. However, the Court also noted that flight is one of the circumstances that must be considered under *Terry*. *Id*. In doing so, however, the Court reiterated that "any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Id*. (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

A close reading of the Court's opinion in *Wardlow* resolves any apparent tension. It was not Wardlow's flight that justified his detention. Rather, it was flight in context with the other circumstances in that case. The circumstances included the fact that police were "patrolling an area known for heavy narcotics trafficking." *Id*. at 121. In fact, the police were traveling in a caravan "because they expected to find a crowd of people in the area, including lookouts and [drug] customers." *Id*. As the police caravan approached Wardlow, police saw him look at them and run, holding a bag as he fled. Given the context, police could reasonably conclude that he was a drug dealer, purchaser, or lookout. Under those

circumstances, allowing officers "confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about business or to stay put and remain silent in the face of police questioning." *Id*. at 125. "*It was in this context that [police] decided to investigate Wardlow after observing him flee*." *Id*. at 124 (emphasis added). When the pursuing police officer caught Wardlow, he immediately conducted a "pat-down search for weapons. . . because in his experience, it was common for there to be weapons in the near vicinity of narcotics transactions." *Id*. at 121-22.

The context here is quite different, and we should not be so quick to ignore the Supreme Court's pronouncement in *Royer* that one who is approached by police "need not answer any question put to him; he may decline to listen to the questions at all and may go on his way." *Royer*, 460 U.S. at 498 (citing *Terry v. Ohio*, 392 U.S. 1, 32-33 (1968)). Of course, Bonner did not walk away; he ran. The Court in *Wardlow* noted that running away is more consistent with guilt than with going about one's business. 528 U.S. at 125 ("[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite."). That was clearly true in Wardlow's case because the area where he was found, the drug activity there and the bag in his hand combined with his flight to create the articulable suspicion required under *Terry*. Here, there is only flight, and my

colleagues concede that "the Supreme Court has never held that unprovoked flight alone is enough to justify a stop." Maj. Op. at 8.

I doubt that the Court in *Wardlow* intended to stretch its focus on running to the extent that the rule in *Royer* would be swallowed, especially since the Court disclaimed any such intent. Thus, I am skeptical that the Supreme Court intended to announce a rule under *Royer* and *Wardlow* that would cause the Fourth Amendment to rest upon the speed with which one chooses to leave an officer's presence. Under such a rule the fundamental guarantees of the Fourth Amendment would vary with a suspect's gait. Until the Supreme Court announces such a rule, I am not willing to conclude that someone in Bonner's situation is free to walk away from a lawfully stopped vehicle, but not free to walk too quickly away or run.

My colleagues repeatedly stress that "Bonner prevented Officer Stewart from controlling the stop by running from the vehicle before the purpose of the stop was even announced." Maj. Op. at 7.[8] I fail to

see the importance of whether the purpose of the stop had been announced or not as the majority's analysis would surely be the same if Officer Stewart had announced the purpose of the stop. Moreover, an individual who exercises his or her constitutional right to leave a police officer will inevitably prevent the police officer "from controlling the stop" and completing an investigation. Given the officers' testimony, our Fourth Amendment inquiry must focus on Bonner's flight, not the resultant loss of control or the inability of police to announce the reason for the stop.

Bonner could have been briefly detained inside of the vehicle, and he could also have been detained pursuant to an order to step outside of the vehicle. In both situations, the detention would be justified by very real concerns about the officers' safety. That is not what happened. The majority's focus misses the point. Absent circumstances that permit the kind of detention authorized by *Mimms* and its progeny, this case must be analyzed under the more restrictive lens of *Terry*, *Royer*, and *Wardlow*. Under the precedent of those cases, flight alone does not give rise to probable cause, or reasonable suspicion. Similarly, police can not rely upon some undefined and untethered notion of "control" to prevent someone from walking away from an interrogation in the absence of probable cause or articulable suspicion where circumstances

---

[8] *See also* Maj. Op. at 6-7 ("[A] police officer has the authority and duty to control the vehicle and its occupants"); *id* at 7, n.1 (". . .Bonner fled before the purpose of the stop was announced, and before the police could exercise the initial control authorized by *Wilson* and other cases."); *id*. at 9 ("[Bonner's] flight prevented the police from discharging their

---

duty of maintaining oversight and control over the traffic stop. . . .").

do not suggest the safety concerns so central to *Terry*, *Mimms* and their progeny. Of course, as I explain above, it is not the arresting officers here who attempt to explain Bonner's arrest in terms of "control"; it is the majority. The officers quite simply state that Bonner was arrested because he ran; and so he was.

Today we therefore hold that "[f]light from a nonconsensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion." Maj. Op. at 9. This is a troubling resolution of a close and difficult case. Reasonable minds can easily disagree about the application of *Wardlow* and *Royer* to the circumstances here. In the final analysis, it may well be that the Supreme Court will resolve the tension I see between those two cases. However, until that day comes, I simply can not agree with the majority's application of Supreme Court precedent.

## III. The Procedural Posture of this Prosecution

There is an additional, and troubling aspect of this case that requires a brief comment. Inasmuch as the possession of the controlled substance found in Bonner's possession after his arrest constituted an offense under both state and federal law, prosecutors initially had the option of prosecuting him in state court or in federal court. For reasons not apparent on this record, prosecutors initially filed state charges and he was prosecuted in state court where the Commonwealth of Pennsylvania charged Bonner with possession with the intent to distribute crack cocaine as well as several misdemeanors and summary offenses. Defending himself in the Court of Common Pleas, Bonner moved to suppress the physical evidence seized from him upon his arrest. He argued that the police lacked reasonable suspicion to initially detain him. Following a hearing on his suppression motion, the Court of Common Pleas granted Bonner's motion and suppressed the evidence that was seized from him on November 29, 2001.

The Commonwealth thereafter appealed the court's suppression order to the Superior Court. However, the Commonwealth was not content to wait until the state appellate court could resolve its appeal. On March 13, 2002, Bonner was indicted in federal court for possessing a controlled substance with intent to distribute. App. at 4, 9. The Commonwealth thereafter withdrew its appeal before the Superior Court of Pennsylvania could rule on it.

The state suppression ruling was based upon that court's interpretation of the Pennsylvania Constitution and the ruling of the district court is, of course, based upon the United States Constitution.[9] Accordingly, the *Rooker-*

---

[9] The Pennsylvania Supreme Court has held that Art. I, § 8 of the Pennsylvania Constitution affords greater protection than the Fourth Amendment of the United States Constitution despite the almost

*Feldman* doctrine is not implicated by what can best be described as a prosecutorial "switcheroo."[10] Nevertheless, I am still concerned that state and federal prosecutors apparently chose to shift this case to federal court while the appeal of the state court's suppression order was pending. I think it fair to assume a significant level of

_____

identical language of the two constitutional provisions. *See Commonwealth v. Edmunds*, 526 Pa. 374, 398 (1991) (refusing to adopt a good faith exception to the warrant requirement as set forth in *United States v. Leon*, 468 U.S. 897 (1984)).

[10] *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923). *See also* Williamson B.C. Chang, *Rediscovering the Rooker Doctrine*, 31 HASTINGS L.J. 1337, 1350 (1980) ("[I]f [federal and state] trial courts could readily annul the judgments of each other on the merits, the prerequisite of finality in the judicial system would be destroyed."); 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 133.30[3][a] (3d ed. 2003). Under *Rooker-Feldman*, lower federal courts cannot entertain a constitutional claim if it has been previously adjudicated in state court, or if the relief requested in the claim requires either determining that the state court's decision is wrong or voiding the state court's ruling. *Gulla v. North Strabane Twp.*, 146 F.3d 168, 171 (3d Cir. 1998).

cooperation and communication between state and federal prosecutors who executed this hand-off in order to execute an end run around the adverse decision of the Court of Common Pleas. Although we have jurisdiction here and must exercise it, this procedural history does not reflect well on the criminal justice system and undermines the appearance of fairness so important to its proper functioning. "[T]o perform its high function in the best way[,] 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U.S. 133, 136 (1955) (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)). In the future, I would hope that concern for the appearance of fairness will constrain prosecutors from engaging in the kind of unexplained tactical manipulation that appears so evident here.