

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-2005

# USA v. Wilmington

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3001

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Wilmington" (2005). *2005 Decisions.* Paper 1443.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1443

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-3001

UNITED STATES OF AMERICA

v.

MARCUS ANTHONY WILMINGTON,

Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No. 01-cr-00151)
District Judge: Honorable James M. Munley

Submitted Under Third Circuit LAR 34.1(a): November 12, 2004

Before: MCKEE and CHERTOFF[*], *Circuit Judges*, and
BUCKWALTER,[**] *Senior District Judge*

(Filed:    March 21, 2005)

OPINION

[*] Judge Chertoff heard oral argument in this case but resigned prior to the time the opinion was filed.  The opinion is filed by a quorum of the panel.  28 U.S.C. § 46(d).

[**] Honorable Ronald L. Buckwalter, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Per Curiam

Appellant Marcus Anthony Wilmington seeks to suppress three kilograms of cocaine that was seized when the Greyhound bus on which he was a passenger was approached at a toll booth by police, and was searched with the consent of its driver. The district court denied his motion to suppress and we will affirm.

The facts relating to the bus search are, for the most part, undisputed.[1] On December 11, 1996, Nat Prather was driving a bus for Greyhound Lines, Inc. from New York City to Cleveland, Ohio, when he stopped to pay the toll at the Delaware Water Gap toll plaza on Interstate 80 in Pennsylvania. Once stopped, Special Agent Ronald Paret of the Pennsylvania Office of the Attorney General, Bureau of Narcotics Investigation and Detective Kirk F. Schwartz of the Monroe County District Attorney's Office approached and asked if he had time to pull to the side of the road so that they could board the bus and "do a routine investigation and inspection." Mr. Prather recognized Agent Paret as he had previously allowed him to inspect his bus pursuant to the then-existing Pennsylvania drug interdiction program. Mr. Prather also knew that the agents were asking "to come on and just routinely inspect and talk" to his passengers "because of drug trafficking." He understood that pulling over was "totally voluntary,"

_____

[1] This Court reviews the factual findings of the district court for clear error. *United States v. Givan,* 320 F.3d 452, 457 (3d Cir. 2003). The district court's factual findings are fully supported by the record.

2

such that he could deny the agents' request if his schedule was tight.

Mr. Prather agreed to pull over, consistent with Greyhound's policy that drivers cooperate with law enforcement when possible, and used the public address system to explain "what was going to take place" to the passengers. The agents, in plain clothes, then entered the bus with their weapons concealed. Agent Paret explained the purpose of the stop over the public address system and he and Detective Schwartz then began to speak with the passengers, starting at the back of the bus. While doing so, passengers were allowed to exit and re-enter the bus at will.

When the agents reached Wilmington, they asked if they could look inside the white plastic bag by his feet which he had identified as his only bag. Wilmington said "Go ahead" and handed the bag to Agent Paret. Detective Schwartz looked though the bag and found, among other things, an apparently brand new pair of size 9 Asics sneakers and a receipt from Saks Fifth Avenue.

After speaking with all the passengers, the agents realized that there was a bag on the bus that no one had identified, so they walked through the bus with the bag -- a shopping bag from Saks Fifth Avenue -- and asked the passengers if it belonged to any of them. No one claimed the bag. Then, with the consent of Mr. Prather, the agents opened the bag and found three kilograms of cocaine inside an apparently new shoe box for size 9 Asics sneakers. The agents returned to Wilmington, realized that the sneakers had been removed from the white plastic bag at his feet, confirmed that the sneakers

3

matched the description on the shoe box, and placed Wilmington under arrest.

Wilmington was indicted by a grand jury in the Middle District of Pennsylvania on April 25, 2001 for distribution and possession with intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1). After a two-day evidentiary hearing, the Honorable James M. Munley, United States District Court, denied his motion to suppress the cocaine in an August 28, 2002 memorandum opinion, finding that there had been no seizure of the bus or of Wilmington for Fourth Amendment purposes. Wilmington entered a plea of guilty on February 21, 2003, conditioned on his right to appeal the motion to suppress decision.

On appeal, Wilmington presents two arguments. First, he asserts that the search and seizure of the bus was not authorized by the driver's consent because it was not voluntary. Second, he asserts that he was seized without probable cause during the resulting search of the bus's interior since he could not leave the bus because there were no other transportation options available. We will address each argument in turn.

A.

Wilmington first challenges the voluntariness of Prather's consent to search the bus. Assuming arguendo, that Wilmington has standing to contest that consent, *see United States v. Price*, 54 F.3d 342, 346 (7th Cir. 1995), the record is clear that Prather's consent was, as he testified, "totally voluntary." There is no evidence coercion. The agents asked "if he would mind speaking with us, if he had the time when he was

4

done paying the fare, when he was complete with his transaction." Prather knew "the routine" if he pulled over since the agents were acting in accordance with the operative Pennsylvania drug interdiction program. He also knew that he was free to deny consent if he did not have time for the officers to enter his bus. While Greyhound encouraged cooperation with law enforcement, Prather knew that he had discretion regarding the decision to pull over. The agents were in plain clothes with concealed weapons, and there were no road barriers directing the bus toward the side of the road.

The district court, therefore, appropriately determined that Wilmington did not establish "anything about the area" or the driver's interaction with the agents "that would make a driver of a bus feel compelled to comply with the law enforcement officer's request." Moreover, we would be hard-pressed to disregard the driver's own testimony that he freely consented. We will affirm the district court's decision regarding the voluntariness of Prather's consent.

B.

Wilmington next asserts that he was seized in violation of the Fourth Amendment while the agents were in the bus. The facts of the case establish that he was not.

While a search or seizure is generally "unreasonable" for Fourth Amendment purposes if it is made without consent and "in the absence of individualized suspicion of wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000), it is not a violation of the Fourth Amendment to "approach bus passengers at random to ask

5

questions and to request their consent to searches," provided a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," *United States v. Drayton*, 536 U.S. 197, 202 (2002) (quoting *Florida v. Bostik*, 501 U.S. 429, 436 (1991)). Just as an officer is constitutionally able to "approach[] individuals on the street or in other public places" with "no basis for suspecting a particular individual," and "pose questions, ask for identification, and request consent to search luggage" under circumstances where a "reasonable person would feel free to terminate the encounter," the officer can initiate the same encounter on a bus without "transform[ing] standard police questioning of citizens into an illegal seizure." *Drayton*, 536 U.S. at 200-02.

Wilmington asserts that neither he, nor any reasonable person, would have felt free to terminate this encounter because the search occurred at a location where there were no other transportation options available, unlike the search in *Drayton* which occurred at a bus stop. The *Drayton* Court, though, considered the confinement generally encountered by bus passengers even at a bus stop, stating that a "passenger may not want to get off a bus if there is a risk it will depart before the opportunity to reboard. The bus rider's movements are confined in this sense, but this is the natural result of choosing to take the bus; it says nothing about whether the police conduct is coercive." *Drayton*, 536 U.S. at 202. Likewise, the passengers' wish to continue their travel on the bus when stopped at a toll booth is not, on its own, confinement in violation of the Fourth Amendment. Because the facts of this case, as reasonably found by the district

6

court, establish that a reasonable passenger would have "fe[lt] free to decline the officers' requests or otherwise terminate the encounter" and that "[t]he officials applied no force, they did not brandish weapons, block exits, threaten, command or use an authoritative tone of voice," (App. 17A (citing *Drayton*, 536 U.S. at 203-04), we will affirm the decision of the district court. Nevertheless, although we affirm the ruling of the district court, it is important that we take this opportunity to express our concern about an aspect of this prosecution.

C.

Prosecutors initially made a deliberate decision, when Wilmington was arrested, to prosecute him in state court. However, prior to trial, Wilmington filed a motion to suppress, arguing that the investigative stop of the bus and subsequent seizure were illegal under Article I, Section 8 of the Pennsylvania Constitution, and the Fourth and Fourteenth Amendments to the U.S. Constitution. The state trial court denied the motion, and Wilmington was thereafter convicted at a bench trial and sentenced to seven to fourteen years in prison.

Wilmington appealed that conviction to the Pennsylvania Superior Court, and on March 31, 1999, that court agreed that the trial court had erred in denying Wilmington's suppression motion under the Pennsylvania Constitution. Accordingly, the court vacated his sentence and remanded for a new trial. *Commonwealth v. Wilmington*, 729 A.2d 1160 (Pa.Super. 1999), *appeal denied*, 771 A.2d 1284 (Pa. 2001). The court held

7

that the Greyhound bus was seized by the officers when the driver pulled over at their request and that, in the absence of reasonable suspicion or probable cause, the random *stopping* of a bus to allow troopers to interrogate the passengers violates Article I, Section 8 of the Pennsylvania Constitution.[1]

729 A.2d at 1162 (emphasis in original). Wilmington was released on bond on July 29, 1999 to await retrial in state court pursuant to the order of the Pennsylvania Superior Court. When released, he had been incarcerated for a little more than two and one-half years (from December 11, 1996, the date of his arrest, until July 28, 1999).[2]

Now discontent with the state forum that they had selected, prosecutors responded to the Superior Court's remand by initiating a new federal prosecution before a federal grand jury. That grand jury returned the instant indictment based upon the cocaine seized from Wilmington on the bus. Wilmington filed another motion to suppress. He argued that both the stop of the bus and the ensuing search and seizure violated the Fourth Amendment because they were not based on a valid consent.

As we have already noted, the district court correctly concluded that the bus driver

---

[1] That provision states: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

The Superior Court noted that "the provisions of Article I, Section 8 of our State Constitution, which predate the Fourth Amendment of the United States Constitution, bestow substantially greater liberty and privacy rights upon the citizens of this Commonwealth than does its federal counterpart." 729 A.2d at 1165 n.4.

[2] Wilmington was released on unsecured bond pending retrial.

voluntarily allowed the investigators to speak with passengers and search the bus and that Wilmington voluntarily spoke to the investigators and consented to a search of his carry-on bag. Following denial of his suppression motion, Wilmington entered a conditional guilty plea pursuant to a plea agreement in which he reserved the right to appeal the denial of his motion to suppress.[3] Following acceptance of a guilty plea to the one count indictment, the district court sentenced Wilmington to a term of 120 months of imprisonment. This appeal followed.

Prosecutors' practice of initiating a federal prosecution if they do not like the decisions in the state forum they selected is not new. In *United States v. Bonner*, 363 F.3d 213 (3d. Cir. 2004), the defendant was charged with possession of a controlled substance in state court after drugs were discovered in his possession following a search incident to arrest by local police. The defendant filed a *pro se* suppression motion, and the trial court granted the motion based upon its conclusion that the seizure violated the Pennsylvania Constitution. The Commonwealth appealed that ruling to the Pennsylvania Superior Court, but while the appeal was pending, Bonner was indicted in federal court based upon the evidence that was then the subject of the Commonwealth's Superior Court appeal. Judge McKee expressed his concern with the procedure there stating:

> I think it fair to assume a significant level of cooperation and
> communication between state and federal prosecutors who

---

[3] Under the terms of the plea agreement, he has the right to withdraw his guilty plea if he prevails on appeal.

executed this hand-off in order to execute an end run around the adverse decision of the Court of Common Pleas. Although we have jurisdiction here and must exercise it, this procedural history does not reflect well on the criminal justice system and undermines the appearance of fairness so important to its proper functioning. . . . In the future, I would hope that concern for the appearance of fairness will constrain prosecutors from engaging in the kind of unexplained tactical manipulation that appears so evident here.

*Bonner*, 363 F.3d at 228-9 (McKee, J. dissenting). Moreover, although Judge Smith was part of the *Bonner* majority, he also condemned the prosecution's conduct stating:

I share the concern for the appearance of fairness expressed by Judge McKee. It is one thing for the government to assume an investigation initiated by state law enforcement officials, or even to adopt a prosecution commenced by state prosecutors. It is quite another to seek a federal indictment where the federal interest in the case is recognized only after state prosecutors have given the case their best shot in the state courts and lost on an issue of state law. Not only does such a tactic offend fundamental notions of fairness, it is contrary to traditional notions of our federalism.

*Bonner*, 363 F.3d at 220-1 (Smith, J. concurring). The situation here is even more egregious. Wilmington served more than two years in prison before the prosecutors executed their "quick pitch" end run around the state courts.

Given the discretion traditionally afforded to prosecutors when a crime can be brought in more than one forum, *see U.S. v. Melendez*, 60 F.3d 41, 50 (2d. Cir. 1995),

10

this forum shopping is not easily remedied.[4] Nevertheless, it important that we not forget the Supreme Court's caution in *In re Murchison*, 349 U.S. 133, 136 (1955). There, the Court quoted *Offutt v. U.S.*, 348 U.S. 11, 14 (1954), stating: "To perform its high function in the best way[,] 'justice must satisfy the appearance of justice.'" It is hard to reconcile that message with what happened here. Moreover, ignoring that message undermines respect for notions of fundamental fairness and for those of us involved in the criminal justice system. All of us involved in that system should be concerned with fundamental fairness.

We are, of course, not privy to all of the considerations that impact a decision to transfer a case from state to federal court. However, it is exceedingly difficult to conclude that the decision here was based upon anything other than prosecutors' dissatisfaction with a judicial decision. The increased penalties and lower constitutional hurdle the federal court offered were the same when Wilmington was first charged in state court as they were when he was thereafter charged for the same conduct in federal court. The federal interest and state interest remained unchanged.

Notwithstanding the concerns that we must once again express, we recognize that this forum switching practice may continue until appellate courts decide to put an end to it. In the meantime, however, we think it important to continue to register our concerns

---

[4] *See U.S. v. Armstrong*, 517 U.S. 456 464-65 (1996) (a defendant must establish by "clear evidence" that a particular prosecutorial decision was predicated on impermissible grounds in order to establish a due process violation).

with this kind of gamesmanship.  It is a practice that is inconsistent with considerations of fundamental fairness and impedes the "high function" of the judicial system that we all should be more concerned about.

_____