# United States Court of Appeals
## For the First Circuit

No. 03-1138

UNITED STATES OF AMERICA,

Appellee,

v.

HÉCTOR JIMÉNEZ-TORRES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lipez, and Howard, Circuit Judges.

Marlene Aponte Cabrera for appellant.
Sonia I. Torres-Pabon, Assistant United States Attorney with whom H.S. Garcia, United States Attorney, Nelson Pérez-Sosa, United States Attorney, and German A. Rieckehoff, Assistant United States Attorney, were on brief, for appellee.

January 11, 2006

**HOWARD**, <u>Circuit Judge</u>.  Defendant Héctor Jiménez-Torres was convicted of violating the Hobbs Act, 18 U.S.C. § 1951(a), and using a firearm in the commission of a violent federal felony (i.e., violating the Hobbs Act) that resulted in a death, 18 U.S.C. § 924(j)(1).  The conviction stemmed from Jiménez's participation in a home invasion, robbery, and murder of a gas station owner in Puerto Rico.  Jiménez appeals his convictions and sentence.  We affirm.

**I.**

We present the evidence in the light most favorable to the verdicts.  <u>See</u> <u>United States</u> v. <u>Nguyen</u>, 246 F.3d 52, 53 (1st Cir. 2001).

Jiménez joined with a group of five other individuals to rob a home in Juana Diaz, Puerto Rico.  The leader of the group was an individual known as "Petete," who selected the house to rob. The owner of the house was Carlos Flores-Rodríguez, the sole proprietor of a local Texaco gas station that was engaged in interstate commerce. In the two months preceding the robbery, Flores' gas station purchased approximately 40,000 gallons of gasoline from the Hess Oil Refinery in the United States Virgin Islands.

On the night before the robbery, Flores' employee, Alex Lugo-Rodríguez, brought the gas station's daily receipts of approximately $600 to Flores at his home.  As was his custom,

-2-

Flores placed the money in a kitchen cabinet with his ring and a revolver.

During the early morning of July 9, 1997, Jiménez and his co-conspirators traveled to Flores' home, carrying two guns. They entered the house and gathered outside the upstairs room where Flores and his wife were asleep. After a few minutes, two of the conspirators brought Flores downstairs to the kitchen. Jiménez remained upstairs.

While remaining upstairs with Flores' wife, Jiménez heard a quick succession of gunshots. One of the conspirators had shot Flores, and he eventually died of his wounds. The conspirators fled but not before stealing the money that was located in the kitchen cabinet. The next day, Flores' gas station closed permanently.

After a five-day trial, the jury convicted Jiménez on the Hobbs Act and use-of-a-firearm counts. He was sentenced to 240 months in prison on the Hobbs Act count and a concurrent life sentence on the use-of-a-firearm count. As part of the statutorily mandated supervised release period imposed, the district court delegated to a probation officer the authority to decide the drug testing and treatment that Jiménez should receive.

## II.

Jiménez raises five arguments on appeal. First, there was insufficient evidence that the robbery of Flores' home affected

interstate commerce -- a prerequisite to conviction under the Hobbs Act.  Second, the jury's verdict was ambiguous on the use-of-the-firearm-count and required more lenient interpretation than was afforded by the district court.  Third, the court abused its discretion by limiting his cross-examination of a government witness.  Fourth, the court abused its discretion by interrupting his closing argument.  Finally, the court improperly delegated to a probation officer the authority to establish the drug testing and treatment conditions of his supervised release term.

## A.    Hobbs Act

The Hobbs Act makes certain robberies federal offenses.  See 18 U.S.C. § 1951(a).  For the government to successfully prove a violation of the Hobbs Act, it must demonstrate that the robbery had an effect on interstate commerce.  See id.  Congress' intent in enacting the Hobbs Act was "to use all [its] constitutional power . . . to punish interference with interstate commerce by extortion, robbery, or physical force."  Stirone v. United States, 361 U.S. 212, 215 (1960).  Given the  statute's broad sweep, even a de minimis  effect  will  suffice  to  meet  the  commerce  element.  See United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003).  Where, as in this case, the crime concerns the robbery of a home rather than of a business, we approach the task of applying the de minimis standard with some caution, lest every robbery (which by definition has some economic component) become a federal crime.

See United States v. Rodriquez-Casiano, 425 F.3d 12, 13 (1st Cir. 2005).

The government offered two ways in which the robbery of Flores' home affected interstate commerce. First, Flores' murder led to the closing of the gas station, a business which had been engaged in interstate commerce. Second, the robbery depleted the assets available to the gas station to participate in interstate commerce. Jimenéz asserts that the government did not present sufficient evidence of either effect.[1]

We review challenges to the sufficiency of evidence de novo, although we take the evidence in the light most favorable to the verdict. See United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 2000). Sufficient evidence may be comprised of direct or circumstantial evidence, or any combination of the two. See United States v. Patel, 370 F.3d 108, 111 (1st Cir. 2004). "The test is whether the evidence, construed favorably to the government, permitted rational jurors to conclude, beyond a reasonable doubt, that [Jiménez] was guilty as charged." See United States v. Sebaggala, 256 F.3d 59, 63 (1st Cir. 2001).

The government may demonstrate an effect on commerce by proving that a robbery resulted in the closing of a business

---

[1] If successful, Jiménez's argument would also require reversal of the derivative firearm conviction because proof of the Hobbs Act violation was an element of that offense. See United States v. Wang, 222 F.3d 234, 240-41 (6th Cir. 2000).

-5-

engaged in interstate commerce. See United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir. 2005) (sustaining Hobbs Act conviction where the evidence showed that the defendants' action caused a business operating in interstate commerce to shut down temporarily); United States v. Cruz-Rivera, 357 F.3d 10, 14 (1st Cir. 2004) (doubting "that there is any serious claim of a constitutionally insufficient interstate commerce connection where a robbery directly results in the shutting down of an interstate business"); see also United States v. Nguyen, 155 F.3d 1219, 1225 (10th Cir. 1998)(holding that effect on commerce in Hobbs Act prosecution was established where, after robbery, business steadily declined and eventually closed); United States v. Guerra, 164 F.3d 1356, 1361 (11th Cir. 1999) (similar); United States v. Jennings, 195 F.3d 795, 802 n.8 (5th Cir. 1999) (similar). This so even if the robbery is of a business owner rather than the business itself. United States v. Diaz, 248 F.3d 1065, 1088 (11th Cir. 2001).

To demonstrate this effect on commerce, the government had to show that the gas station was engaged in interstate commerce and that Flores' murder caused the station to close. See Vega-Molina, 407 F.3d at 527. The evidence that the gas station participated in interstate commerce was straightforward. The Texaco general manager for the area in which Flores' gas station operated testified that, in the two months preceding Flores' murder, the station had purchased approximately 40,000 gallons of

gasoline, all of which originated from a refinery located in the United States Virgin Islands.[2]  This evidence was sufficient to establish that the gas station engaged in interstate commerce.  See Capozzi, 347 F.3d at 337 (holding that evidence that car dealer purchased cars from out of state established sufficient connection to interstate commerce); United States v. Diaz, 248 F.3d 1065, 1091 (11th Cir. 2001) (holding that evidence that gas station purchased gasoline from out of state established sufficient connection to commerce).

To establish that Flores' murder was the cause of the gas station's closing, the government offered the testimony of Flores' employee, Alex Lugo-Rodríguez.  Lugo testified that he worked at the gas station the day before the murder and that, when he arrived for work the next day, the gas station was closed and he learned that "something had happened" to Flores.  According to Lugo, the gas station did not subsequently reopen.

While there was no direct testimony that Flores' murder caused the gas station to close, Lugo's testimony provided strong circumstantial evidence to that effect.  The timing of the closing -- the day after the murder -- coupled with its permanence, allowed the jury to conclude that the murder caused the closing.[3]

---

[2] The Hobbs Act defines "commerce" to include commerce among United States territories.  See 18 U.S.C. § 1951(b)(3).

[3] At oral argument, Jiménez suggested that only the consequences flowing from the robbery (and not the murder) could be

-7-

The government also presented adequate evidence to prove that the robbery depleted the gas station's assets. Depletion of the assets of a business engaged in interstate commerce is a common method for demonstrating that a robbery had an effect on interstate commerce. See Rodriguez-Casiano, 425 F.3d at 13. This is so even if the business's assets were stolen from a home. See id.

There was testimony that the stolen money consisted of the gas station's daily receipts which, as was his custom, Flores stored in his kitchen cabinet. From this testimony, the jury could have reasonably determined that the robbery reduced the gas station's revenue by $600, thereby depleting the assets that station had available to participate in interstate commerce. See Capozzi, 347 F.3d at 337 (government demonstrated a de minimis effect on commerce where defendant deprived business of money, thereby depleting the assets that could have been used to participate in interstate commerce); Nguyen, 246 F.3d at 54 (money stolen from a business engaged in interstate commerce establishes jurisdictional element of Hobbs Act violation); see also United States v. Devin, 918 F.2d 280, 293-94 (1st Cir. 1990) (Hobbs Act

---

considered in measuring the effect on commerce. According to Jiménez, because the robbery itself did not result in the closing of the gas station, there was no effect on commerce. We disagree. Both the murder and the robbery violated the Hobbs Act, and each may be considered in determining the effect on commerce. See Vega-Molina, 407 F.3d at 527 (considering consequences of robbery and related murder in determining the effect on commerce for purposes of the Hobbs Act); Nguyen, 155 F.3d at 1225 (similar).

jurisdiction was established where money was stolen from the personal funds of a business owner because the jury could infer that the depletion of the owner's assets would ultimately deplete the assets of the business). While the amount stolen was relatively small, it was adequate to support a Hobbs Act conviction. See United States v. Brennick, 405 U.S. 96, 100 (1st Cir. 2005) (stating that theft of $522 from a large business engaged in interstate commerce had sufficient effect on commerce to support a Hobbs Act conviction).

Moreover, even if one of the government's effect on commerce theories was inadequate to independently trigger the Hobbs Act, the effects taken together suffice to establish federal jurisdiction. The government proved that, as a result of Jiménez's conduct, the assets of a business engaged in interstate commerce were depleted and the business was forced to close permanently. See Vega Molina, 407 F.3d 511 (1st Cir. 2005) (aggregating effects on commerce to conclude that the government established Hobbs Act violation). Jiménez may not have intended to cause these effects but his intent is irrelevant to establishing the commerce element of a Hobbs Act offense. See United States v. Moore, 363 F.3d 631, 638 (7th Cir. 2004), vacated on other grounds sub nom., 125 S.Ct. 1019 (2005); United States v. Shareef, 190 F.3d 71, 75-76 (2d Cir. 1999). In sum, whether the government's theories are considered individually or in tandem, there was sufficient proof that the

robbery affected interstate commerce.

### B.    Use of a Firearm

On the use-of-the-firearm count, the jury found Jiménez guilty "as charged" in the indictment.  Jiménez contends that this general verdict was ambiguous as to whether the jury convicted him of using a firearm in connection with a violent federal felony that resulted in a death, 18 U.S.C. § 924(j)(1), or of the lesser-included offense of using a firearm in connection with a violent federal felony, see 18 U.S.C. § 924(c)(1)(A).  He argues that the district court erred by assuming that he was convicted of the more serious charge.  This argument was not raised below, and therefore we review it for plain error.  See Fed. R. Crim P. 52(b); United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995).  A defendant is only eligible for relief under Rule 52(b) if he can identify a clear error that affected his substantial rights and undermined "the fundamental fairness or basic integrity of the proceeding below in some major respect."  Taylor, 54 F.3d at 973.

We look to the indictment and jury instructions to interpret the verdict.  See United States v. Cannon, 903 F.2d 849, 852-53 (1st Cir. 1990).  The indictment charged that

> [Jiménez and others] aided and abetted by each other
> did knowingly, wrongfully and unlawfully use and
> carry a firearm during and in relation to a crime of
> violence which is a felony that may be prosecuted in
> a court of the United States, that is, to affect
> interstate commerce by robbery, in violation of 18
> U.S.C.  §  1951(a)(2)  and  in  the  course  of  the
> violation to Title 18 U.S.C. §  924(c)(1)(A) the

-10-

> defendants caused the death of Carlos Flores-Rodríguez, through the use of the firearm . . . . All in violation of 18 U.S.C. § 924(j)(1).

The indictment unambiguously charged Jiménez with violating § 924(j)(1). It also, as a matter of law, charged him with the lesser-included offense of using a firearm during a federal crime of violence in violation 18 U.S.C. § 924(c)(1)(A). See United States v. Motley, 940 F.2d 1079, 1082 (7th Cir. 1991) ("A lesser-included offense is . . . by definition included in an indictment charging a greater offense.").

While Jiménez's indictment included the lesser-included offense, no lesser-included-offense instruction was given to the jury. The court instructed that Jiménez was charged with "aiding and abetting others in using a firearm during and in relation to a crime of violence; specifically that crime of violence being to affect interstate commerce by robbery and in the course of that offense unlawfully causing the death of Carlos Flores-Rodríguez." (Emphasis supplied). In light of this instruction specifically referring to Flores' death, and the absence of a lesser-included offense instruction, the court did not plainly err in interpreting the jury's verdict as constituting a conviction under § 924(j)(1).

### C. Limits on Cross-Examination

Jiménez next contends that his Sixth Amendment right to confront witnesses was infringed by limits placed on his cross-examination of a government witness. He concedes that our review

is only for plain error.

Jiménez complains that he was not permitted to effectively cross-examine the Texaco general manager who testified concerning the interstate commerce engaged in by Flores' gas station. On cross-examination, Jiménez attempted to ask about the amount of intrastate business that the gas station conducted to show that the station's "economic production was not . . . significant [enough] to affect interstate commerce." But after several questions, the district court ruled that the amount of intrastate business performed by the gas station was not relevant to whether the gas station participated in interstate commerce.

Under the Sixth Amendment, a defendant is entitled to cross-examine a government witness. See United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st Cir. 2000). But the court "retains wide latitude to impose reasonable limits on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material." United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004).

There was no plain error in preventing Jiménez from questioning at length about the amount of intrastate business conducted by Flores' gas station. The evidence firmly established that the station made substantial out-of-state purchases of gasoline. Testimony about the station's intrastate business was of, at best, marginal relevance, given the extent of its out-of-

-12-

state business.  See supra at 8.  The court therefore reasonably curtailed Jiménez's questioning on this issue.  See United States v. Callipari, 368 F.3d 22, 37 (1st Cir. 2004) (stating that the district court properly limited cross-examination after "it determined that further inquiry was repetitive or would lead the jury astray").[4]

### D.    Closing Argument

During closing argument, Jiménez's counsel made the following argument:

> [T]he sufficiency of the evidence is another matter that is important in this case because you have to find sufficient evidence to convict the defendant. . . . There is a lot of evidence that has not been introduced with [respect to] Hector Jiménez-Torres. There is a lot of evidence that has not been brought before you that would have been very good for you to see for example the machete.  Where is the machete? Did it have fingerprints?  Did someone have it and then place it elsewhere?  Where [are the coconspirators]?  Not here.  They could have taken the  stand and said yes [Jiménez] was there.

At the conclusion of this argument, the government interrupted and said, "Your honor, counsel had the same opportunity to call these witnesses.  The court responded, "That is correct . . . [The]

---

[4]  Jiménez also challenges the district court's ruling preventing him from asking the general manager to explain her comment, made on direct examination, that the gas station had not been open every day in the period preceding the murder.  Jiménez asked this question to highlight the limited business that the gas station was conducting before the robbery.  For the reasons discussed above, it was also not plain error to prevent Jiménez from pursuing this line of questioning.

defendant has a right to request the court, if you cannot pay for those witnesses to come, to subpoena them and bring them to court."

Jiménez contends that these statements suggested that he should have called the absent witnesses and thereby impermissibly shifted the burden of proof to him. He did not raise this issue below, and we therefore review the claim for plain error.

This argument satisfies the first prong of the plain error test as the comments were improper. Attorneys may not argue that the jury should draw an inference against an opponent where the opponent does not present witnesses that are available to both parties. United States v. Johnson, 467 F.2d 804, 808 (1st Cir. 1972); see also United States v. Virgen-Moreno, 265 F.3d 276, 290 (5th Cir. 2001); United States v. Simpson, 974 F.2d 845, 848 (7th Cir. 1992). We recently distinguished this situation from a case where the defense highlights missing proof to argue that there was insufficient evidence of the defendant's guilt. See United States v. Diaz-Diaz, --F.3d--, 2005 WL 3536540, at *4 (1st Cir. Dec. 28, 2005). In Diaz-Diaz, we held that defense counsel's identification of missing witnesses to argue evidentiary insufficiency was a proper argument. Id. Therefore, the prosecutor's contention before the jury that the defense could have called the absent witnesses impermissibly suggested that the defendant had the burden to present the missing evidence. Id.

This case is similar to Diaz-Diaz. Jiménez's counsel

-14-

identified a series of witnesses that the government did not call to argue that the government had not presented sufficient evidence to warrant conviction. Like Diaz-Diaz, counsel's argument was not aimed at having the jury draw a negative inference against the government but rather to argue that the government failed to prove its case. It was therefore incorrect for the government and the court to state that Jiménez could have called the absent witnesses.

While Jiménez has established error, he has not demonstrated that the error was clear or obvious. See United States v. Patel, 370 F.3d 108, 118 (1st Cir. 2004). Diaz-Diaz was decided after this case was argued on appeal and was thus unavailable when the offending comments were made. Moreover, the error here is not so obvious that the court should have necessarily recognized it without an objection from Jiménez or the benefit of Diaz-Diaz. Indeed, in Diaz-Diaz, we observed that determining whether there is error by stating, in front of the jury, that the defense could have called absent witnesses is a matter "of degree" and that the prosecutor's comments in that case (which were similar to the ones at issue here) were "technically improper [but] approached the margin of propriety." 2005 WL 3536540, at *4. Given the closeness of the issue, we cannot conclude that the error was clear or obvious.

Furthermore, Jiménez has not demonstrated that the error affected his substantial rights. See United States v. Padilla, 415

-15-

F.3d 211, 220 (1st Cir. 2005). Shortly after the erroneous comments, the court instructed the jury that the burden of proof remained with the government at all times and that the defendant did not have any obligation to present evidence to prove his innocence. In Diaz-Diaz, we held that instructions reminding the jury that the burden of proof remained with government were sufficient to dispel the prejudice from the prosecutor's improper comment, even where the defendant preserved the issue for appellate review. 2005 WL 35356540, at *4. Here, where the issue is unpreserved and the court reminded the jury that Jiménez was not required to produce evidence, the offending comments were not so severe that the error affected Jiménez's substantial rights.

### E. Supervised Release

The final issue concerns the conditions of Jiménez's supervised release. The district court delegated to a probation officer the power to determine the number of drug tests to be performed and the type of drug treatment, if any, that Jiménez should receive. Jiménez did not object to this condition. Therefore our review is again for plain error. Citing a prior panel decision of this court, United States v. Meléndez-Santana, 353 F.3d 93 (1st Cir. 2003), the government conceded plain error.

Since the government made its concession, however, our law regarding unpreserved Meléndez-Santana errors has changed. Sitting en banc, we have recently held that a defendant raising an

-16-

unpreserved Meléndez-Santana error on appeal does not automatically satisfy the plain-error standard. See United States v. Padilla, 415 F.3d 211, 220-23 (1st Cir. 2005) (en banc). In appeals briefed before but decided after Padilla, we have not accepted the government's concession of plain error for a Meléndez-Santana claim. See United States v. Sánchez-Berríos, 424 F.3d 65, 81 (1st Cir. 2005). Instead, we consider Jiménez's plain error argument independently. See id.

For the reasons stated in Padilla, 415 F.3d at 220-23, Jiménez has not established either the third or fourth prongs of the plain-error standard. He has not demonstrated that there is a reasonable probability that he would receive more favorable supervised release conditions if resentenced, or that the delegation error was of such consequence that it undermines public faith in the judicial process. See id.; Sánchez-Berríos, 424 F.3d at 82.

## III.

For the reasons stated, we **affirm** Jiménez's conviction and sentence.

**Concurring opinion follows.**

-17-

**TORRUELLA**, <u>Circuit Judge</u> **(Concurring).** I write separately, because although both the majority and I are required to affirm Jiménez's conviction by reason of binding circuit precedent,[5] I believe that this precedent is based on an interpretation of the Hobbs Act, 18 U.S.C. § 1951(a), that extends Congress' power to regulate interstate commerce beyond what is authorized by the Constitution.[6]

The unvarnished facts in this case are as follows: Jiménez and five other cohorts were "look[ing] for <u>houses</u> to rob." <u>See</u> Government's Brief at 6 (emphasis added). The group's leader randomly chose a house, which they then proceeded to break into. Once inside, they found the owners of the house, husband and wife, asleep in an upstairs bedroom. Thereafter, two of the burglars forced the husband downstairs to the kitchen at gunpoint. Jiménez remained upstairs with the wife. While there, he heard a series of shots emanating from the downstairs area. One of the burglars had shot and wounded the husband, from which wounds he subsequently

---

[5] <u>See</u> <u>United States</u> v. <u>Rodríguez-Casiano</u>, 425 F.3d 12, 15 (1st Cir. 2005) (finding the robbery of business proceeds from the home of a business owner to be a sufficient nexus with interstate commerce under the Hobbs Act); <u>United States</u> v. <u>Nguyen</u>, 246 F.3d 52, 54-55 (1st Cir. 2001) (same).

[6] Although, as applied to the facts of this case, this interpretation also extends the Hobbs Act beyond Congress' intention, this issue was not raised on appeal. <u>See</u> <u>United States</u> v. <u>Miles</u>, 122 F.3d 235, 243-45 (5th Cir. 1997) (DeMoss, J., specially concurring).

died.  Before they left, the burglars robbed the dying man of $600 he had stashed in a cabinet in his kitchen.

These facts spell out the criminal substance of this case.  However, in its zeal to make this unfortunate incident into something it is not -- criminal activity implicating core federal interests -- the government adds the following circumstances that were revealed about the deceased husband, Carlos Flores-Rodríguez, in the course of the investigation of this local crime and which were presented as evidence in the case against Jiménez: (1) Flores-Rodríguez was the sole proprietor of a local Texaco gas station; (2) in the two months prior to the burglary, the gas station had purchased approximately 40,000 gallons of gasoline from the Hess Oil Refinery in the United States Virgin Islands; (3) on the night before the burglary, an employee of the gas station brought approximately $600 to Flores-Rodríguez at his home, which sum constituted the daily receipts of the gas station, and which Flores-Rodríguez placed inside his kitchen cabinet for safe keeping; and (4) the day after Flores-Rodríguez's death, the gas station closed permanently.

Upon this exiguous thread of irrelevant evidence, the government casts a net that, if allowed to set without challenge, would elbow out large chunks of traditional state criminal jurisdiction and federalize such crimes.  The issue does not relate to an ideologically charged debate about whether or not federal is

better than state action.  See Sara Sun Beale, Too Many and Yet Too Few: New Principles to Define the Proper Limits for Federal Criminal Jurisdiction, 46 Hastings L.J. 979 (1995).  The point in question is about giving validity to the constitutional dogma that establishes that, other than by constitutional exception, "the suppression of violent crime and vindication of its victims" is a power that "the Founders denied the National Government and reposed in the States."  United States v. Morrison, 529 U.S. 598, 618 (2000).  Although Congress may, pursuant to both the Commerce Clause and the Necessary and Proper Clause,[7] enact statutes creating a broad range of federal crimes, González v. Raich, 125 S. Ct. 2195, 2216 (2005) (Scalia, J., concurring), there must be appropriate facts establishing the federal jurisdictional underpinnings required by the Constitution.  United States v. López, 514 U.S. 549, 567 (1995).  Such conditions are not present in this case.

The Hobbs Act states that "[w]hoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery, or extortion, or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or

---

[7]  U.S. Const. art. I, § 8 ("The Congress shall have power to . . . regulate commerce with foreign nations, and among the several states" and to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers.").

-20-

purpose to do anything in violation of this section" has committed a federal crime.  18 U.S.C. § 1951(a).  Although Congress' intent in enacting the Hobbs Act was undoubtably "to use all [its] constitutional power . . . to punish interference with interstate commerce by extortion, robbery, or physical force," Stirone v. United States, 361 U.S. 212, 215 (1960), this statute must be read in the context of what is allowed to be regulated by the Commerce Clause.  The Commerce Clause permits Congress to create federal crimes for offenses "directed at the instrumentalities, channels or goods involved in interstate commerce." Morrison, 529 U.S. at 618. The facts of this case are far removed from these strictures, and no amount of prosecutorial inventiveness or incantation can convince me that interstate commerce is implicated in this case, heinous as the actions of Jiménez and his cohorts may have been.

We are not faced here with the robbery of decedent's local gas station, which would bring the government closer to the interstate nexus it so vehemently seeks by reason of that business purchasing goods in interstate commerce.  Nor is this a case of Jiménez waylaying the decedent on his way to the bank with the proceeds of interstate sales.  It is not even a case of the robbers intercepting decedent and forcibly depriving him of the local gas station's receipts while he was on the way home.  Although all of these scenarios would cause me to hesitate as to the impact of such criminal activity on interstate commerce, certainly those examples

-21-

would be closer to providing the required constitutional jurisdictional nexus that is missing in the present case. Here, all criminal activity took place in decedent's <u>home</u>, the stolen funds had come to rest in decedent's <u>kitchen</u>, and there is no evidence that Jiménez or his cohorts even knew of their existence before decedent's <u>home</u> was fortuitously picked to be burglarized. <u>See</u> <u>United States</u> v. <u>Min Nan Wang</u>, 222 F.3d 234, 240 (6th Cir. 2000) (finding that the Hobbs Act did not encompass the robbery of business proceeds from the home of business owners even though the robber once worked for the business). There was in fact no connection between the perpetrators of the robbery and decedent's business.

Under the government's theory of causation, if the decedent had taken the money out of the kitchen hiding place, gone to the supermarket, and been robbed of this money, shot, and killed by a person holding up the supermarket, a Hobbs Act violation could be charged since the original source of those funds was a business in interstate commerce and his business was never able to reopen after the depletion of those funds and the owner's death. What about the hold up of a neighborhood ice cream truck selling national brand products, in which the driver is killed resisting the robber, as a result of which his estate must file for bankruptcy? Would the government blink at calling that a Hobbs Act violation? At the rate we are going, perhaps the day will come

when the federal government will see fit to prosecute the robbery of a child's roadside lemonade stand because the lemons came from California, the sugar was refined in Philadelphia, and the paper cups were manufactured in China.

I cannot agree that the federal government has the constitutional power to prosecute Jiménez for a violation of the Hobbs Act given the facts proven in this case.  See Morrison, 529 U.S. 598; López, 514 U.S. 549.  However, because precedent binds me until such time as the Supreme Court puts an end to the fictions that allow the apparently limitless aggrandizement of federal power into areas reserved to the states by the Constitution, I have no choice but to concur in the affirmance of Jiménez's conviction.