

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-2007

# USA v. Rutherford

Precedential or Non-Precedential: Non-Precedential

Docket
No. 06-1437

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Rutherford" (2007). *2007 Decisions.* Paper 886.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/886

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-1437
_____

UNITED STATES OF AMERICA

v.

DANIEL RUTHERFORD,

Appellant.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 05-cr-00126)
(District Judge: Honorable Legrome D. Davis)

_____

Argued April 24, 2007

Before: McKEE and AMBRO, <u>Circuit Judges</u>,
and ACKERMAN, <u>Senior District Judge</u>.[*]

(Filed:   June 26, 2007)


MAUREEN KEARNEY ROWLEY
Chief Federal Defender
DAVID L. McCOLGIN
Assistant Federal Defender
Supervising Appellate Attorney
ROBERT EPSTEIN (argued)

_____

[*]Honorable Harold A. Ackerman, Senior United States District Judge for the District
of New Jersey, sitting by designation.

Assistant Federal Defender
Suite 540 West – The Curtis Center
601 Walnut Street
Philadelphia, Pennsylvania 19106-2414
*Attorneys for Appellant*

PATRICK L. MEEHAN
United States Attorney
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
ARLENE D. FISK (argued)
Special Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
*Attorneys for United States*

_____

OPINION OF THE COURT
_____

ACKERMAN, <u>Senior District Judge</u>.

Defendant/Appellant Daniel Rutherford appeals his conviction under the Hobbs

Act, 18 U.S.C. § 1951. The Hobbs Act makes robbery a federal crime where the robbery

affects interstate commerce. Because the Government presented sufficient evidence for

a reasonable jury to conclude that Rutherford's robberies affected interstate commerce,

we will affirm.

**I.**

On July 7, 2003 and again four days later on July 11, Defendant Daniel Rutherford

robbed the DePativo Chiropractor Center ("DCC") at 6100 Spruce Street in Philadelphia.

DCC was operated by Drs. Carl and Anthony DiPativo, father and son. At the time of

the robberies, DCC had three offices:   6100 Spruce Street in Philadelphia ("Spruce Street office"), another on North Broad Street in Philadelphia ("North Broad Street office"), and one on West White Horse Pike in Berlin, New Jersey ("New Jersey office").   The Spruce Street office was on the ground floor of a residential apartment building.   The two chiropractors worked at the offices along with various receptionists and nurses.   Each chiropractor often worked in more than one office per day.   Among its services, DCC provided its patients with cervical collars and pillows, back supports, rib braces, neck braces, and cold packs.   DCC purchased most of these items from Plymouth Bell Laboratories in Pennsylvania, which in turn purchased the goods from manufacturers around the country.   DCC also obtained some medical items directly from out-of-state providers.   The supplies for both Philadelphia offices were shipped to the North Broad Street office.

Rutherford's first robbery of the Spruce Street office occurred at approximately 1:30 p.m. on July 7, while the office was open and treating patients.   Rutherford entered DCC and pretended to be a potential patient.   After sending an elderly patient into a treatment room, Dr. Carl DePativo spoke to Rutherford.   Rutherford drew a handgun, pointed it at the doctor, and demanded money.   Rutherford then forced Dr. Carl DePativo into a rear office, closed the door, and demanded a watch from the doctor's desk.   The doctor gave Rutherford the cash from his pocket – approximately $390 – and the watch.   After ordering the doctor to stay in the room until he was gone, Rutherford left the office.

3

The doctor then informed the police.

The second robbery, on July 11, 2003, took place at approximately 4:00 p.m. at the Spruce Street office. Rutherford was accompanied by Elijah Smith. Dr. Anthony DePativo was on duty, along with receptionist/medical assistant Leida Perez. Rutherford and Smith pretended to be potential patients. Smith asked for water, and Rutherford asked if the doctor was available. Perez answered that he was, and Rutherford identified himself to her as a new patient named Mike Westcott. When Perez turned away, Rutherford walked into Dr. Anthony DePativo's office, drew a gun on him, and demanded money. Smith remained in the reception area, drew a gun on Perez, grabbed her by the arm, and forced her into Dr. Anthony DePativo's office. The two robbers demanded money and drugs, but were told that there were no drugs in the office. Rutherford searched the drawers in the office for drugs, but found none. Rutherford then demanded the money from the doctor's pockets. Rutherford and Smith stole $10 from the doctor and $5 from Perez, as well as jewelry from both victims, the doctor's credit card, and Perez's duffle bag, which contained her wallet, cell phone, and identification. The total value of the stolen cash and items was approximately $900. The robbers ordered the doctor and Perez to remain in the rear office while they fled, and before leaving, the robbers pulled the office phone wires out of the wall.

On the evening of the second robbery, Dr. Anthony DePativo cancelled his appointments for patients he had scheduled to see in the New Jersey office that evening,

4

and reported the robbery to the police. No evidence at trial suggested that the patient appointments were not successfully rescheduled, i.e. no evidence indicated that patient hours or income were lost.

After these two armed robberies in four days in July 2003, the doctors and staff became frightened. According to testimony by Dr. Carl DePativo, DCC cancelled all of its patient appointments at the Spruce Street office "[t]he week after" the robberies and had a new security door system installed. (J.A. 87.) No testimony suggested that these appointments were not rescheduled or that any patient hours were ultimately lost. Approximately eight months later, in March 2004, DCC closed the Spruce Street office, apparently because the doctors and staff were still too frightened to continue working at that location. Dr. Carl DePativo testified that "nobody wanted to work" in the office because employees were "all . . . skittish about what had happened." (J.A. 88.) The North Broad Street and New Jersey offices remain open. No testimony at trial suggested that DCC's use of medical supplies manufactured out-of-state declined from the time of the robbery until the closing of the Spruce Street office.

On March 8, 2005, a grand jury in the Eastern District of Pennsylvania returned an indictment against Rutherford, charging him with: two counts of interference with interstate commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); one count of conspiracy to interfere with interstate commerce by robbery, in violation of the Hobbs Act and 18 U.S.C. § 2; and two counts of knowingly using and carrying a firearm

5

during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).

Rutherford pled not guilty. After a two-day trial, the jury returned a guilty verdict on all counts in September 2005. On January 30, 2006, the District Court sentenced Rutherford to 509 months' imprisonment: 125 months on the robbery counts and 384 months on the firearm counts, to run consecutively. The court also sentenced Rutherford to five years' supervised release and imposed restitution of $1,290. Rutherford filed a timely appeal with this Court. Rutherford only appeals his conviction and does not appeal his sentence.

## II.

Rutherford argues that there was insufficient evidence presented at trial to support the jury's guilty verdict under the Hobbs Act. While this Court's review of a challenge to the sufficiency of the evidence is plenary, *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir. 2005), such an argument places a "very heavy burden on an appellant" because we employ "a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence," *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). Accordingly, when reviewing a jury verdict for insufficient evidence, we do not weigh the evidence or determine the credibility of the witnesses, but will "view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Voigt*, 89 F.3d 1050, 1080 (3d Cir.

6

1996) (citation and internal quotation marks omitted)).  Only if no rational jury could have found the essential elements of a crime beyond a reasonable doubt can we vacate a jury's verdict.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Mussare*, 405 F.3d at 166.  "Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible."  *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984).

Rutherford also appeals the District Court's denial of his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.  As with review of the jury verdict for insufficient evidence, our review of a motion for judgment of acquittal "is plenary and, in exercising that review, we must interpret the evidence in the light most favorable to the government as the verdict winner."  *United States v. Taftsiou*, 144 F.3d 287, 290 (3d Cir. 1998).

The Hobbs Act makes robbery a federal crime where the defendant "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce."  18 U.S.C. § 1951(a).  "The question of whether a defendant's acts satisfy the jurisdictional predicate of the Hobbs Act is one of law," *United States v. Buffey*, 899 F.2d 1402, 1407 (4th Cir. 1990), and "[t]he charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference," *Stirone v. United States*, 361 U.S. 212, 218

(1960). However, the burden on the Government is very low. If the robbery "produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution" under the Hobbs Act. *United States v. Haywood*, 363 F.3d 200, 210 (3d Cir. 2004) (quoting *Jund v. Town of Hempstead*, 941 F.2d 1271, 1285 (2d Cir. 1991)). The Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone*, 361 U.S. at 215.

The Government contends that the interstate commerce requirement of the Hobbs Act was met here by the following evidence: 1) DCC was an open and active business engaging in and affecting interstate commerce at the time of the robberies; 2) DCC used medical items that traveled in interstate commerce; 3) after the second robbery, Dr. Anthony DePativo cancelled patient appointments at the New Jersey office because the doctor was at the police station; 4) the week following the robberies, DCC closed the Spruce Street office for a day to install a new security door; and 5) approximately eight months later, DCC closed the Spruce Street office because "they just weren't willing to work there anymore because of the fear that these robberies began." (J.A. 462).

Rutherford claims on appeal that the Government did not offer sufficient proof of the interstate commerce nexus to support his conviction under the Hobbs Act. He stresses that no money or property of the DCC business was stolen in the two robberies;

rather, only personal property and personal cash were stolen from the Drs. DePativo and Ms. Perez. He also notes that the Government presented no evidence that DCC lost any patients or patient hours, or purchased fewer supplies from out-of-state manufacturers after the robberies. Rutherford argues that installation of the new security door and eventual closing of the Spruce Street office should not be considered as effects of the robberies, as these events were too remote in time and were future-oriented, preventative measures. Such measures "to try to enhance their security" "might just as well have been taken if [the DePativos] had been mugged in the street, or if one of the residential tenants in their building had been similarly robbed." (Rutherford Br. at 9-10.)

### III.

At first blush, one could reasonably question, under our federalist system, whether an otherwise "garden-variety" armed robbery of individuals in a chiropractic office could constitute a federal crime. Indeed, Rutherford's argument on appeal boils down to the contention that the "offenses here were of a quintessentially local variety and as such they were for the [Commonwealth] of Pennsylvania to prosecute, not the federal government." (Rutherford Br. at 10, 13.) As we discuss below, prosecution of these crimes by the Commonwealth of Pennsylvania might have been a more prudent course of action. However, federal courts – including our Court – have repeatedly and almost uniformly construed the Hobbs Act's interstate commerce requirement extremely broadly. We have required only a "potential" or "*de minimis*" effect on interstate commerce to support a

9

Hobbs Act conviction.  *See, e.g.*, *United States v. Urban*, 404 F.3d 754, 766 (3d Cir. 2005); *Haywood*, 363 F.3d at 209-10; *United States v. Clausen*, 328 F.3d 708, 711 (3d Cir. 2003).

*Urban* involved extortion by Philadelphia plumbing inspectors and specifically considered the "depletion of assets" theory, "whereby proof that a Hobbs Act violation depletes the assets of a business engaged in interstate commerce conclusively establishes the effect on commerce requirement."  *Urban*, 404 F.3d at 762.  In upholding the convictions in *Urban*, we discussed our consistent and repeated endorsements of the depletion of assets theory, and more generally the rule that proof of merely a *potential* effect on commerce is all that is needed under the Hobbs Act.  *Id.* at 763-67.[1]  Based on our review of extensive Third Circuit precedent in *Urban*, we reiterated that all that is required under the Hobbs Act is a "reasonably probable effect on commerce, however minimal."  *Urban*, 404 F.3d at 763-64 (quoting *United States v. Cerilli*, 603 F.2d 415, 424 (3d Cir. 1979)); *see also Urban*, 404 F.3d at 763 ("[T]he Hobbs Act may constitutionally be construed to reach the indirect burdens placed on interstate commerce by the extortionate activities alleged in this case and that such a construction of the statute accords with Congressional intent to proscribe extortion which 'in any way or degree

---

[1] At oral argument, we asked counsel for Rutherford if he had cited *Urban* in his briefs, and if not, why.  Counsel responded that "we do cite *Urban* in our reply brief."  After a close review of both Rutherford's initial and reply briefs, we could not locate any citation to, let alone discussion of, *Urban*.  We suggest that counsel be more careful in the future.

10

obstructs, delays, or affects commerce.'" (*quoting United States v. Mazzei*, 521 F.2d 639, 642 (3d Cir. 1975) (en banc))).  As we noted in *Urban*, the overwhelming weight of authority from our sister circuits supports the "potential effect," *de minimis* reading of the Hobbs Act.  *Urban*, 404 F.3d at 765 n.3.

Rutherford first argues that, as a constitutional matter, the Supreme Court's opinion in *United States v. Lopez*, 514 U.S. 549 (1995), dictates that, even under a *de minimis* standard, this Court should not allow the Government to "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the states." (Rutherford Br. at 14 (citing *Lopez*, 514 U.S. at 567).)  The defendant in *Urban* raised the same theory, contending that *Lopez* and its progeny – *United States v. Morrison*, 529 U.S. 598 (2000), and *Jones v. United States*, 529 U.S. 848 (2000)[2] – cast constitutional doubt on the "potential effect" reading of the Hobbs Act and requires a finding of an "actual effect."  *Urban*, 404 F.3d at 766.  The *Urban* court rejected this argument, as did our earlier opinion in *Clausen*.  *Clausen* held that the Hobbs Act "regulate[s] activity which occurs locally but which has an explicit nexus with interstate commerce, and [is] therefore distinguishable from the statutes at issue in *Lopez* and *Morrison*."  *Clausen*, 328 F.3d at 711.  In *Clausen*, "we followed the lead of other circuits, including the Fifth

---

[2]It should be noted that *Jones*, while addressing Congress's authority under the Commerce Clause, ultimately avoided the constitutional question and held that the statute under review did not reach to the fullest extent of Congress's commerce power.  *Jones*, 529 U.S. at 856-58.

11

Circuit, which had held that after *Lopez*, 'legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce.'" *Urban*, 404 F.3d at 766 (citing *United States v. Robinson*, 119 F.3d 1205, 1211 (5th Cir. 1997)). *Clausen* and *Urban* endorsed the view of the Fifth Circuit in *Robinson* that "'the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce,' and that substantial effect empowers Congress to regulate pursuant to the Commerce Clause." *Clausen*, 328 F.3d at 711 (quoting *Robinson*, 119 F.3d at 1215); *see also Urban*, 404 F.3d at 766. Thus, we reject Rutherford's argument that *Lopez* and its progeny invalidate his conviction under the Hobbs Act.

Turning to the statutory standard, Rutherford primarily argues that even under the *de minimis*, potential effects test, "the effect still must be more than a speculative, attenuated 'one step removed' kind of effect." *United States v. Mattson*, 671 F.2d at 1020, 1023 (7th Cir. 1982). He contends that the effects cited by the Government were too attenuated in time and cause from the robberies to qualify as effects, whether actual or potential, of the robberies, and that the robberies should at least be analogized to robberies of an individual on the street rather than robberies of a business.

With regard to the latter theory, courts have indeed been hesitant to find the requisite interstate commerce nexus in cases involving robberies of individuals that have some connection with interstate commerce, and especially involving robberies of

12

individuals in the home.  *See United States v. Jiminez-Torres*, 435 F.3d 3, 7-8 (1st Cir.

2006) ("Where . . . the crime concerns the robbery of a home rather than of a business, we

approach the task of applying the de minimis standard with some caution, lest every

robbery (which by definition has some economic component) become a federal crime.");

*see also, e.g.*, *United States v. Perrotta*, 313 F.3d 33, 36-40 (2d Cir. 2002); *United States

v. Turner*, 272 F.3d 380, 384-85 (6th Cir. 2001).   Rutherford indicates that his reliance

on cases such as these "is not to suggest that [his] argument is dependant upon the

characterization of this case as a robbery of an individual rather than a business."

(Rutherford Br. at 16 n.6.)

Despite this disclaimer, his argument boils down to just such an inapt

characterization.   Rutherford stresses that he and his accomplice only stole personal cash

and assets of employees at DCC, and no evidence suggests that property of the business

was taken.   He therefore contends that the DePativos "might well have" decided to take

their subsequent actions – cancelling patient appointments, installing a new security door

at the Spruce Street office, and eventually closing the Spruce Street office – "if they had

been mugged outside of their office or if one of the residential tenants in their building

had been robbed."   (Rutherford Br. at 19.)   If indeed this were the case, Rutherford

might have a colorable argument that the effect on interstate commerce of the robberies of

personal property was too attenuated.   But these robberies took place *in the office* of a

business engaged in interstate commerce.   Rutherford's Hobbs Act convictions depended

13

not just on the fact that the victims worked for a business engaged in interstate commerce, but also on the crucial facts that the robberies occurred *in* the place of business during business hours, and that Rutherford posed as a patient – a customer – of the business.

Rutherford's argument is akin to that rejected by the First Circuit in *United States v. Vega Molina*, 407 F.3d 511, 527 (1st Cir. 2005). The defendants in *Vega Molina* robbed employees in a business office engaged in interstate commerce, and argued on appeal that the "government failed to prove any effect on commerce because the perpetrators only took money from [the office's] employees, not from the business itself." *Id.* The First Circuit dismissed defendant's argument as "specious" and declared that "[i]t conveniently overlooks the profound effect" that defendant's robbery had on the victim's office. *Id.* It reasoned that "[t]he commission of a violent crime in the workplace inevitably will constitute a wrenching, if unquantifiable, blow to morale and productivity." *Id.* (holding that robbery at business, coupled with business closing the office the next day, constituted "more than adequate" evidence "to demonstrate at least a de minimis effect on commerce").

The same reasoning applies here. Rutherford's robberies had a clear effect on morale and productivity at DCC, as demonstrated by the DePativos' trial testimony, the installation of a new security door, and the subsequent closing of the office. Rutherford relies on the notion that the Government failed to offer any proof that the robberies resulted in any depletion of assets, reduction in purchases of interstate supplies, or loss of

patient hours.   However, even though the cancelled patient appointments apparently were rescheduled, these cancellations constitute, at minimum, a *potential* effect on interstate commerce and an obstruction of interstate commerce.   The Hobbs Act requires no more. Based on the facts of this case, for the Government to meet its burden, it simply did not need to present proof that DCC suffered any actual loss of patient hours or other depletion of assets.

In addition, Rutherford attempted to steal drugs from the doctors' offices; this attempt constituted a potential effect on interstate commerce in that Rutherford sought to steal business property and thereby disrupt commerce.   In *Perrotta*, the Second Circuit outlined several instances "where a robbery or extortion of an employee of a business engaged in interstate commerce would likely support Hobbs Act jurisdiction."   313 F.3d at 37.   One such instance is where "the crime targeted the assets of a business rather than an individual."   *Id.* at 38.   Here, Rutherford targeted in part the business assets of DCC, and searched some part of the office for drugs, even if he only succeeded in stealing the personal assets of DCC's employees.

Rutherford further contends that DCC's installation of a new security door approximately one week after the robberies was not an effect of the robbery because the old door was not damaged in the robbery, and was installed as an attempt "to ensure that no additional robberies would occur in the future."   (Rutherford Br. at 18.)   It goes too far on Rutherford's part to depict the installation of the new security door as merely a

15

"discretionary security measure" (Rutherford Reply Br. at 3 n.1) rather than a response to and effect of the robbery. The door was installed as a direct response to the robbery and its installation at least potentially affected interstate commerce by forcing the cancellation of patient appointments. Rutherford claims that if the "discretionary security measure" here provided a sufficient basis for federal jurisdiction, then "the Act would apply to virtually any street mugging so long as any businesses in the area reacted to the crime by purchasing some type of additional security." (Rutherford Reply Br. at 3.) Maybe so, and perhaps under Rutherford's alternative scenario the Hobbs Act might be stretched too far. But again, such a case is not us. DCC did not install the new security door in response to a mugging down the street; rather, the door was installed to assuage fears at the victimized office resulting from a robbery in the office just one week prior. Rutherford accuses the Government of applying an "Alice in Wonderland" approach and "hypothesiz[ing] a different robbery than the one that actually occurred." (Rutherford Reply Br. 7.) Yet the Government may indeed rely on "potential" effects. Rutherford, on the other hand, repeatedly "hypothesizes a different robbery" than the two he committed, and his reading of the "effects" of his robberies is too narrow under the law of this and other Circuits.

Finally, Rutherford challenges the sufficiency of proof of the interstate commerce nexus by focusing on the length of time between the robberies and the closing of the Spruce Street office. He relies on *Perrotta*, in which the Second Circuit suggested that,

16

in assessing jurisdiction under the Hobbs Act, a court should examine the "time frame charged in the indictment." *Perrotta*, 313 F.3d at 39-40.[3]  Here, the Indictment against Rutherford only charges the robberies on July 7 and 11, 2003, and does not expressly charge a time period that includes March 2004, when DCC closed the Spruce Street office.  We recognize that, generally, there must be some outer temporal limit of relevance in a Hobbs Act case.  However, based on the Supreme Court's and our Court's broad reading of the Hobbs Act, a jury may appropriately determine whether a certain act was an effect of the robbery on a case-by-case basis.  Here, trial testimony clearly established that the DePativos closed the Spruce Street office due to the continued fear and unease of employees and patients at the office in the months following the robberies.  As Dr. Carl DePativo testified,  "nobody" wanted to work in the office because they were "skittish about what had happened."  (J.A. 88.)  The closing of the office, coupled

---

[3]In *Perrotta*, the Second Circuit declined to rely on evidence that the private dispute between the victim and the defendant affected the business where both worked because the alleged effects on the business occurred outside the range of time charged in the indictment.  *Perrotta*, 313 F.3d at 38-39.  However, *Perrotta*'s discussion of time frame is distinguishable here.  *Perrotta* considered an appeal from the retrial of the defendant. For the second trial, the Government redrafted and narrowed the indictment against the defendant in part to preclude evidence of a prior business dispute between the defendant and the target of his extortion, apparently to avoid the jury having "sympathy for defendant and dislike for the victim."  *Id.* at 39.  "At every opportunity, the government used the narrowed indictment to support evidentiary objections to events outside the time frame charged."  *Id.*  Because the Government based its Hobbs Act prosecution on effects related to the business dispute and that occurred "well outside" the time frame charged in the indictment, *id.*, the Second Circuit   refused to allow the Government, colloquially speaking, to "have its cake and eat it too."  Clearly, such concerns are absent in our case.

17

with the earlier effects of the robberies – both actual and potential – rise to the level of a *de minimis* effect on interstate commerce sufficient to sustain a conviction under the Hobbs Act. Based on the circumstances surrounding the closing of the office, combined with the other evidence presented, a reasonable jury could find that the Hobbs Act's interstate commerce requirement was met.[4]

## IV.

At oral argument, counsel for the Government represented that this case was prosecuted in federal court because of information received from Elijah Smith, Rutherford's accomplice in the second robbery, and S.W., Rutherford's friend who worked at times for DCC. Smith and S.W. pled guilty to a series of federal crimes unrelated to the offenses before us, and during the course of their cooperation with the United States Attorney's Office for the Eastern District of Pennsylvania provided information about Rutherford and the DCC robberies.

As discussed above, sufficient evidence supported Rutherford's conviction under the Hobbs Act. However, the prosecution of Rutherford in federal court for these robberies nonetheless implicates federalism concerns of fundamental importance. "[T]he

---

[4]Rutherford argues that the District Court should not have admitted evidence regarding the new security door and closing of the Spruce Street office because they were too distant in time from the robberies and therefore not relevant to proving the requisite effect on interstate commerce. We review the District Court's admission of evidence for abuse of discretion. *United States v. Frazier*, 469 F.3d 85, 87 (3d Cir. 2006). Because the subsequent activities were effects of the robberies and relevant to the Hobbs Act inquiry, the District Court did not err in admitting such evidence.

18

Hobbs Act was intended to reach only certain activities that hamper interstate business, reflecting the long-recognized principle that the states are best positioned and equipped to enforce the general criminal laws." *United States v. Collins*, 40 F.3d 95, 101 (5th Cir. 1994). In our federalist system, the Pennsylvania state government might have been "best positioned and equipped" to prosecute Rutherford here. The federal authorities might have been the first, with the assistance of the cooperating federal defendants, to procure information crucial to prosecuting Rutherford, but this alone should not have prevented informing Pennsylvania authorities of this information and allowing the Commonwealth to handle this case. While there was sufficient evidence here to support conviction under the Hobbs Act based on the *de minimis* interstate commerce requirement, the federal government might better focus its resources and unique expertise on truly "federal" matters and, where possible, leave enforcement of general criminal laws to the states.

## V.

The Government offered sufficient proof that Rutherford's robberies affected interstate commerce such that federal jurisdiction and conviction under the Hobbs Act were proper. A rational jury could easily find that his robberies had at least a *de minimis*, potential effect on interstate commerce. Rutherford's convictions under § 924(c) for carrying a firearm in connection with a crime of violence also depend on his robberies being federal crimes. We will affirm Rutherford's convictions in their entirety.

19

AMBRO, <u>Circuit Judge</u>, with whom Judge McKee joins, concurring.

I join Judge Ackerman's fine opinion. I write separately, however, to add to the comments made about prosecuting Rutherford at the federal level. As our opinion today makes clear, prosecuting numerous "garden-variety" crimes is within the Federal Government's power under the Hobbs Act. That is the natural consequence of Congress's decision to regulate the crime of robbery to the fullest extent of its commerce power. Indeed, the breadth of the Hobbs Act was not lost on Congress at the time of its passage.[5]

What we see here, though, is a relatively new use of the Hobbs Act that deserves comment. At the age of only 25, Daniel Rutherford is already a career criminal—enough so to exceed the criminal history points necessary to reach a criminal history of VI (the maximum) under the Sentencing Guidelines. As numerous commentators have written, federal sentences are typically much longer than their state counterparts. *See, e.g.*, Ronald F. Wright, *Federal or State? Sorting as a Sentencing Choice*, 21 CRIM. JUST., Summer 2006, at 16, 17–19; John S. Baker, *Jurisdictional and Separation of Powers Strategies To Limit the Expansion of Federal Crimes*, 54 AM. UNIV. L. REV. 545, 575–76 (2005); Task Force on the Federalization of Criminal Law, Am. Bar Ass'n, The

---

[5] The House Judiciary Committee's Minority Report lambasted the nascent Hobbs Act for federalizing traditional state crimes. H.R. REP. NO. 78-66, at 14 (1944). The Majority Report did not deny it; rather, it emphasized Congress's "exclusive and unlimited power to regulate interstate commerce." *Id.* at 9. Similarly, in floor debate Representative Hobbs responded to criticism that the Act was aimed exclusively at organized labor by noting that it applied to *all* robberies and extortions with some effect on interstate commerce. 91 CONG. REC. 11912 (1945) (statement of Rep. Hobbs).

1

Federalization of Criminal Law 14–15 (1998). In particular, brandishing a firearm while committing a crime brings a mandatory consecutive seven-year sentence, and a second such offense brings a mandatory consecutive 25-year sentence. 18 U.S.C. § 924(c)(1). The catch, of course, is that the predicate offense must be a federal crime. Thus, by prosecuting Daniel Rutherford for two Hobbs Act violations in which he brandished firearms, the Government achieved a *mandatory* 32-year sentence for the gun crimes, and a Guidelines-recommended range of 10–12 additional years for the Hobbs Act violations. Thus, we have Rutherford's 42-year sentence—a length that would be unthinkable in many state systems for these underlying facts.[6]

What has this wrought? By prosecuting Rutherford at the federal level, the Federal Government has effectively incapacitated a career criminal for the remainder of his adult life. To do so, however, it has overridden the default state criminal system in what looks like a classic state-law crime.[7]

---

[6] For a comprehensive overview of how federal gun-related enhancements have spurred federal prosecutors to involve themselves with traditionally state crimes, see generally Sara Sun Beale, *The Unintended Consequences of Enhancing Gun Penalties: Shooting Down the Commerce Clause and Arming Federal Prosecutors*, 51 DUKE L.J. 1641 (2002).

[7] As Judges McKee and Smith noted in *United States v. Bonner*, 363 F.3d 213 (3d Cir. 2004), judges should tread carefully when criticizing a legitimate use of prosecutorial discretion, as that power is not ours to wield. *Id.* at 219–20 (Smith, J., concurring); *id.* at 228 (McKee, J., dissenting). Yet it is difficult in this case not to point out this new and probably unanticipated use of the Hobbs Act. It is also hard not to wonder whether prosecuting this garden-variety robbery in order to obtain a virtual life sentence is the best use of scarce federal resources.